**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **FRANCISCO SOSA** | : | |
| **Petitioner** | : | |
| | : | |
| **v.** | : | **C.A. 05-123 ML** |
| | : | |
| **A.T. WALL, DIRECTOR OF** | : | |
| **DEPARTMENT OF CORRECTIONS,** | : | |
| **Respondent** | : | |

**STATE'S RESPONSE TO PETITIONER'S**
**PETITION FOR WRIT OF HABEAS CORPUS**

Pursuant to Rule 5 of the Rules Governing § 2254 Cases, and as directed by this Court's Order of April 4, 2005, the Attorney General of the State of Rhode Island (the "State") files this Response to Petitioner Francisco Sosa's petition for writ of habeas corpus. Section I of the State's Response addresses the various housekeeping issues raised by Rule 5. Section II of the State's Response gives the factual background of the case, and Section III responds to petitioner's allegations by moving for entry of summary judgment on all claims. Section III also demonstrates that resolution of petitioner's claims does not require an evidentiary hearing. For the reasons set forth in Section III, *infra*, the State respectfully maintains that the petition has no merit and should be dismissed with prejudice.

## I. HOUSEKEEPING MATTERS RAISED BY RULE 5 OF THE RULES GOVERNING § 2254 CASES

### A. Exhaustion

As is detailed below in Section III, all but the last of petitioner's five claims is fully exhausted.

3

**B. Availability of Transcripts**

The State does not have in its possession a copy of the trial transcript in this case. Should the Court wish to review the transcript, the State will attempt to obtain and to provide copies of such materials as directed by the Court. To the extent the Court wishes to review other materials, the State would endeavor to provide copies to the Court as promptly as possible, as long as the superior court file is available.

**C. Petitioner's Appellate Brief**

As required by Rule 5, Rules Governing § 2254 Cases, the State is submitting with this Response a copy of the appellate brief petitioner filed in the state supreme court during the course of his direct appeal. The petitioner's brief is attached at Tab A.

**D. State Court Opinions**

As required by Rule 5, the State is submitting with this Response a copy of the Rhode Island Supreme Court's opinion in State v. Sosa, 839 A.2d 519 (R.I. 2003). The opinion is attached at Tab B.

**II. THE STATE COURT DECISION – FACTUAL BACKGROUND**

Petitioner stands convicted by a Rhode Island superior court jury of first-degree murder and possession of a firearm without a license. He is currently serving a sentence of life imprisonment. On December 22, 2003, petitioner's convictions were affirmed in all respects by the Rhode Island Supreme Court in an opinion authored by Justice Maureen McKenna Goldberg. State v. Sosa, 839 A.2d 519 (R.I. 2003). As previously indicated, a copy of the opinion is attached at Tab B for the Court's reference.

The facts underlying petitioner's convictions are found in Sosa, 839 A.2d at 522-23, and are set forth below:

On July 20, 1998, Bethzaida Vega (Bethzaida) hosted an afternoon cookout in the backyard of her first-floor apartment at 527 Cranston Street in Providence. Among the guests were Bethzaida's friend Wanda Cruz (Wanda), Bethzaida's neighbor LaTesha Tate (LaTesha), and LaTesha's friends, Erica Cambero (Erica) and Hugo Andino (Hugo). As the cookout drew to an end, Wanda's son, "CJ," came into the house and alleged that Sosa, who lived at 531 Cranston Street, had "smacked" him after he and Sosa's son argued. This prompted an argument between Wanda and Sosa, who denied having hit CJ. Bethzaida testified that Wanda shoved Sosa, who, in turn "smacked her around a couple of times," causing her to fall to the floor. Bethzaida then brought Wanda inside her apartment, away from defendant.

Erica testified that Hugo went into the kitchen and then left the house brandishing a kitchen knife. He chased Sosa down the driveway and off the property, at one point coming within ten to fifteen feet of catching him. Sosa filed a complaint with the Providence Police the next day. In the complaint, Sosa reported that the previous afternoon he had witnessed a ten-year-old boy holding his four-year-old son by the throat. When he went outside, he observed the same boy holding his son by his feet and dangling him over a wall. According to Sosa's police complaint, when he intervened, a Hispanic female approached him and punched him in the mouth, and then a Hispanic male threatened him with a knife and chased him off the property.

Defense witness Ana Puello, another resident of 527 Cranston Street, testified to a slightly different version of events. She said that she witnessed the interaction between Sosa and CJ from her apartment window. According to her, Sosa did not hit the child, and the boy lied when he told his mother that Sosa had "smacked him." The witness testified that three women then accosted Sosa, striking him and yelling "kill him." She said she also saw Hugo chase Sosa with a knife.

LaTesha testified that a few days later, on July 23, 1998, she was in the living room of her first-floor apartment at 527 Cranston Street playing cards and drinking beer with Erica, Hugo, and another man. Both LaTesha and Erica testified that about 6 p.m., Sosa came to LaTesha's apartment door asking for Bethzaida. LaTesha did not open the door, but did look through the peephole. She testified that Sosa was wearing a dark blue shirt with a Red Sox logo. A few minutes later, Sosa appeared outside LaTesha's living room window and pointed out Hugo to his wife, saying: "That is him, I am going to get him." Sosa also yelled to Hugo directly, saying: "I am going to get you."

When Bethzaida arrived home a short time later, LaTesha reported defendant's threatening remarks. Bethzaida testified that

she then went outside to retrieve her two children. While she was standing in the alleyway between the two apartments, she encountered Sosa's wife and warned her that her husband's behavior was endangering the children. At that point, she observed Sosa, gun in hand, climbing the fence that divided the two yards. Bethzaida also noticed that Sosa was wearing a blue shirt with a Red Sox logo. Bethzaida screamed to LaTesha to lock the doors, and ran to her eight-year-old son, who was playing basketball on the other side of the house. As she was bringing her older son inside, she heard a gunshot.

LaTesha and Erica testified that they heard Bethzaida yell a warning that Sosa was approaching with a gun. LaTesha, Erica, and Hugo ran toward the front porch, where Bethzaida's two-year-old son was playing. LaTesha stopped to pick up the phone and dial 911, while Erica and Hugo continued outside onto the porch. Erica testified that she saw Sosa approach Hugo with his hand behind his back, and that as the decedent reached down to pick up the two-year-old, Sosa shot him in the back. Hugo managed to get the child into LaTesha's apartment before collapsing on the floor; he was taken to Rhode Island Hospital, where he died during emergency surgery. Chief Medical Examiner Elizabeth Laposata, M.D., testified that death resulted from massive internal bleeding caused by a bullet that passed into Sosa's back and through his large bowel and mesenteric artery.

Responding police investigators took Bethzaida, LaTesha, and Erica to Providence police headquarters. Each gave a separate statement, and each selected Sosa's photograph as that of the shooter.

Over defense objection, the state was allowed to read the testimony of Antonio Gonzalez (Gonzalez) into the record. Gonzalez was a prosecution witness at a previous trial against Sosa for these same crimes. That trial resulted in a hung jury. Gonzalez was declared unavailable at this trial after police efforts to locate him proved unsuccessful. Gonzalez previously had testified that as he was leaving a Cranston Street liquor store on the evening of July 23, 1998, he heard a gunshot. He noticed a man wearing a red and blue shirt with a gun in his hand. The man ran into the parking lot of Gonzalez Taxi, where Gonzalez worked. Gonzalez Taxi is across the street from the Cranston Street liquor store. Gonzalez testified that although he did not see the man discard the weapon, he saw him leave the lot without the gun. Gonzalez then went toward the back corner of the lot and discovered a firearm under a red rug. That revolver, along with a .38-caliber projectile recovered from Hugo's body, were examined by Robert Hathaway of the University of Rhode Island Crime Laboratory, who determined that the fatal bullet was fired from that particular weapon.

> As noted, Sosa's first trial, in June 2000, resulted in a mistrial because the jury was unable to reach a unanimous verdict. Sosa was retried before a second jury in October 2000 and was found guilty of first-degree murder and possession of a firearm without a license. His motion for a new trial was denied on November 10, 2000, and on January 16, 2001, the trial justice imposed a mandatory life sentence for the first-degree murder conviction and a ten-year sentence on the illegal-weapon charge. This appeal followed.

Sosa, 839 A.2d at 522-23 .

## III. THE STATE IS ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW BECAUSE THE FACTUAL FINDINGS OF THE RHODE ISLAND SUPREME COURT MUST BE PRESUMED TO BE CORRECT AND THE HABEAS PETITION LACKS LEGAL MERIT

Petitioner Francisco Sosa ("petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 claiming that the trial court made an erroneous evidentiary ruling, improperly refused to give a second degree murder instruction, permitted a constitutionally infirm jury panel, and improperly denied his new trial motion; petitioner as well asserts an ineffective assistance of counsel ground. For the reasons set forth below, petitioner's claims lack merit. Based on the presumptively correct and binding factual findings of the Rhode Island Supreme Court, the State is therefore entitled to judgment as a matter of law.

### A. Applicable AEDPA Principles

This Court's consideration of petitioner's claims is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Section 2254(d)(1) provides:

> **(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court

> proceedings unless the adjudication of the claim--
> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

The meaning of § 2254(d)(1) was extensively explicated in Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495 (2000). The United States Supreme Court summarized its analysis in Williams in relevant part as follows:

> As we stated in Williams, § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. 529 U.S., at 404-405, 120 S.Ct. 1495. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. *Id.*, at 405-406, 120 S.Ct. 1495. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. *Id.*, at 407-408, 120 S.Ct. 1495. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams that an unreasonable application is different from an incorrect one. *Id.*, at 409-410, 120 S.Ct. 1495. *See also id.*, at 411, 120 S.Ct. 1495 (a federal habeas court may not issue a writ under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly").

(Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850 (2002).)

The United States Court of Appeals for the First Circuit in McCambridge v. Hall, 303 F.3d 24 (1st Cir. 2002), elaborated on how to apply the "unreasonable application" prong of § 2254(d)(1). McCambridge advises federal courts to bear in mind that, under Williams v. Taylor, an "erroneous application" of Supreme Court precedent is not necessarily tantamount to an "unreasonable application" of such precedent. McCambridge, 303 F.3d at 36. Rather, in order to be an "unreasonable application," "'some increment of incorrectness beyond error is required' . . . [in an amount] great

enough to make the [state court's] decision unreasonable in the independent and objective judgment of the federal court." *Id.* (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)). As examples of what might be considered "unreasonable," McCambridge refers to a state court decision "devoid of record support for its conclusions, or [one that] is arbitrary." *Id.* at 37. *See also* Rashad v. Walsh, 300 F.3d 27, 45 (1st Cir. 2002)(fact that state court opinion did not discus petitioner's major argument in his favor did not render state court result "unreasonable"). Conversely, "if it is a close question whether the state [court] decision is in error, then the state decision *cannot* be an unreasonable application." McCambridge, 303 F.3d at 36 (emphasis added).

Furthermore, state court decisions must be affirmed primarily on the basis of United States Supreme Court holdings clearly established as of the time of the state court proceedings. Rashad, 300 F.3d at 35. Nevertheless, in assessing the reasonableness of the state court's determination, it is appropriate for this Court to consult factually similar cases from the lower federal courts, particularly "when the relevant Supreme Court rule is broad and applies to a kaleidoscopic array of fact patterns." *Id.* *See also, e.g.,* Ouber v. Guarino, 293 F.3d 19, 26 (1st Cir. 2002).

Finally, a federal court's obligation to adhere to 28 U.S.C. § 2254(e)(1) becomes pivotal. Under § 2254(e)(1),[1] unless petitioner can demonstrate otherwise by the heavy burden of clear and convincing evidence, this Court must credit as correct the state court's factual determinations, regardless of whether the findings were made by the

[1] Section 2254(e)(1) provides: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

Rhode Island superior or the Rhode Island supreme courts. Rashad, 300 F.3d at 35, 44-45; *see also, e.g.,* Bui v. Haley, 279 F.3d 1327, 1334 & n.11 (11th Cir. 2002); King v. Bowersox, 291 F.3d 539, 540-41 (8th Cir. 2002). The First Circuit has explained that:

> AEDPA provides that in a habeas proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). For this purpose, "factual issues" are defined as "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators."

Coombs v. Maine, 202 F.3d 14, 18 (1st Cir. 2000) (citations to cases and internal quotation marks omitted). And, binding factual findings also include the reasonable inferences drawn from the record and the factual characterizations made by the state court after reviewing the record before it, even if the federal court could have drawn a different set of inferences. *See, e.g.,* Rashad, 300 F.3d at 39 n.7 (even if federal court could have drawn different factual inferences by assuming defense testimony was true, "[t]he crucial fact, however, is that the state court did not draw such an inference, and the AEDPA requires that we leave the choice between reasonable alternatives to the state tribunal."); *see also id.* at 38-39, 44-45.

Absent petitioner's rebuttal of the state court's factual findings by clear and convincing evidence, such findings (including, of course, the state courts' credibility determinations) are binding on this Court. Coombs, 202 F.3d at 18; Campbell v. Vaughn, 209 F.3d 280, 281, 288, 290 (3d Cir. 2000) *cert. denied*, 531 U.S. 1084, 121 S.Ct. 789 (2001); *see also, e.g.,* Edwards v. Murphy, 96 F. Supp. 2d 31, 39, 46 (D. Mass. 2000); Dias v. Maloney, 156 F. Supp. 2d 104, 106 (D. Mass. 2001) ("This Court adopts [the state supreme court's] recitation of facts, as is proper absent clear and convincing

evidence that casts doubt on the state court's determination.") (citing, *inter alia*, Hurtado v. Tucker, 245 F.3d 7, 10 & n.4 (1st Cir.), *cert. denied*, 122 S.Ct. 282 (2001).

### B. Summary Judgment Standards

When reviewed in light of the foregoing statutory standards and presumptions, petitioner's claims must fail and the State therefore seeks entry of summary judgment as to all grounds set forth in the habeas petition. This Court's review of the State's motion for summary judgment is generally governed by the traditional standards set forth in Fed. R. Civ. P. 56. *See, e.g.,* Murdock Webbing Co., Inc. v. Dalloz Safety, Inc., 213 F. Supp. 2d 95, 97-98 (D.R.I. 2002) (discussing summary judgment standards of Fed. R. Civ. P. 56(c)); Casey v. Newport School Committee, 13 F. Supp. 2d 242, 244-45 (D.R.I. 1998) (same). Additionally, because this case involves a question of summary judgment on a petition for habeas corpus, under § 2254 this Court must "'presume all state court findings of fact to be correct in the absence of clear and convincing evidence [to the contrary].'" Ogan v. Cockrell, 297 F.3d 349, 356 (5th Cir. 2002) (citation omitted) (involving summary judgment entered on habeas petition governed by AEDPA). *Accord, e.g.,* Workman v. Bell, 178 F.3d 759, 765 (6th Cir. 1998) (involving summary judgment entered on pre-AEDPA petition).

### C. Petitioner's Four Exhausted Habeas Claims Lack Legal Merit, And His Fifth, Unexhausted, Claim Renders the Entire Petition "Mixed".

#### 1. Ground One

Petitioner argues that the Rhode Island Supreme Court erred in affirming the admission of "the prior recorded testimony of Antonio Gonzalez." (*Petitioner's Motion for Habeas Corpus Under 28 U.S.C. 2254* at 2.) The Rhode Island Supreme Court's lengthy discussion of this issue (State v. Sosa, 839 A.2d at 524-26), however, can hardly

be characterized as an "unreasonable application of *** clearly established Federal law, as determined by the Supreme Court of the United States" 28 U.S.C. § 2254 d(1). Indeed, the State would respectfully submit, as "Sosa has the opportunity to develop Gonzalez's previous testimony through cross-examination" (State v. Sosa, 839 A.2d at 524), there is no colorable Confrontation Clause claim at all; the only question being whether the admission of such prior testimony comported with the Rhode Island Rules of Evidence. The State would submit that not only did the Rhode Island Supreme Court properly answer this latter question, but that such (State law evidentiary) question is not even properly cognizable in federal habeas corpus. *See e.g.* Neverson v. Farquharson, 366 F.3d 32, 45 (1st Cir. 2004)(noting that "even if the state court erred in barring [a witness's] testimony as a matter of Massachusetts evidence law *** habeas relief is not available for violations of state law"); Jammal v. Van De Kamp, 926 F.2d 918, 919 (9th Cir. 1991)("We are not a state supreme court of errors; we do not review questions of state evidence law. On federal habeas we may only consider whether the petitioner's conviction violated constitutional norms."). Finally, the State would submit that even if the decision of the Rhode Island Supreme Court on this question were not correct, and even if the question was cognizable in federal habeas corpus, petitioner would still not be entitled to a new trial because such prior testimony of Gonzalez, in view of the totality of the evidence presented by the State, could have constituted no more than harmless error.

This ground, then, ought to fail as a matter of law.

**2. Ground Two**

Petitioner's next claim for relief contends that the trial court "err[ed] in refusing to instruct [the] jury on the offense of murder in the second degree" (*Petitioner's Motion*

*for Habeas Corpus Under 28 U.S.C. 2254* at 3). The State, however, would respectfully suggest that this allegation ought not even to be cognizable in federal habeas corpus. *See* Paulding v. Allen, 393 F.3d 280, 282-83 (1st Cir. 2005)(although not deciding issue, noting that "some courts, applying AEDPA, have held that a habeas petition predicated on [a claim involving the failure to give a lesser included instruction] *** must be dismissed as not clearly established under federal law".)[2] Even assuming that it is, however, the Rhode Island Supreme Court's discussion of and conclusion with respect to this jury-instruction issue (State v. Sosa, 839 A.2d at 526-27) certainly cannot be characterized as an "unreasonable application of *** clearly established Federal law, as determined by the Supreme Court of the United States" 28 U.S.C. § 2254 d(1).

This ground, respectfully, must fail as a matter of law as well.

**3. Ground Three**

Ground Three of petitioner's habeas petition asserts that the lower court erred in "summarily denying the defense motion to dismiss the jury panel due to the systematic exclusion of minorities therefrom" (*Petitioner's Motion for Habeas Corpus Under 28 U.S.C. 2254* at 4-5.) With respect to this contention, the Rhode Island Supreme Court determined as follows:

> The defendant's third assignment concerns the constitutional adequacy of the jury panel from which defendant's jury was selected. The panel consisted of approximately forty potential jurors, of which two apparently were of minority ethnicity. Just before the trial started, one of the potential minority jurors came forward and admitted to the court that she knew defendant and his mother and

[2] Even under the pre-AEDPA law, the First Circuit had held that "[a] prudential restriction on federal habeas review in noncapital cases to instances where the failure to give a lesser included offense instruction threatens a fundamental miscarriage of justice accords with general due process standards." Tata v. Carver, 917 F.2d 670, 671-72 (1st Cir. 1990).

had discussed the case with her. When the trial justice asked the potential juror whether she had formed an opinion of the case, the juror responded, "Of course, your Honor. I won't lie about that. Of course." The trial justice excused her.

After the potential juror was disqualified, defense counsel pronounced himself "troubled by the fact that, with the exception of the juror who was just excused, there appears to be perhaps one member of a discernable minority community [remaining]." Counsel suggested that members of the African-American and Latino communities were being excluded systematically from the jury selection process, and moved to dismiss the panel on grounds that it did not represent a fair cross-section of the community. The trial justice denied Sosa's motion as untimely, ruling that it should have been directed at the entire venire and not delayed until this particular panel was selected from a larger juror pool.

The United States Supreme Court has held that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." Taylor v. Louisiana, 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). To demonstrate a *prima facie* violation of the fair-cross-section requirement, the defendant must establish: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process." Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *see also* State v. Johnson, 116 R.I. 449, 457, 358 A.2d 370, 375 (1976) (holding that "a defendant who complains about an absence from the jury of representatives from an identifiable segment of the community must prove that their absence is due to a preconceived plan conceived by those who are responsible for the formulation of the jury lists").

In our opinion, the trial justice did not abuse his discretion in denying defendant's motion to dismiss the panel. Although defense counsel articulated the appropriate showing necessitated by *Taylor* and *Duren* to challenge the jury selection process, he failed to demonstrate any of the three factors set forth in those cases. Instead, defendant waited until a minority juror was disqualified and then moved to dismiss the particular panel outright. Given defendant's inability to provide any proof whatsoever to support his contentions, the trial justice correctly rejected the motion to dismiss the panel. *See* State v. Gaines, 528 A.2d 305, 308-09 (R.I.1987) (in which the "defendant makes neither an allegation nor a showing that the jury selection process *** has resulted in the systematic and deliberate exclusion of members of a particular race, *** defendant has clearly

> not met his burden of proof; thus the denial of his motion was not error"). If defendant was not ready to proceed with the requisite proof at the time of his motion, the appropriate step would have been to request a continuance and hearing so he could develop his allegations in an appropriate proceeding. Defense counsel did not request a hearing, leaving the trial justice no choice but to deny the motion to disqualify the particular jury panel. Johnson, 116 R.I. at 457, 358 A.2d at 375.
>
> Moreover, even if defense counsel had established that the jury selection process was constitutionally flawed, dismissing the particular jury *panel* would scarcely have remedied the problem. The Sixth Amendment is designed to prevent the state from utilizing a *system* that deliberately excludes groups of potential jurors from the entire jury pool. State v. Clark, 112 R.I. 270, 275, 308 A.2d 792, 795 (1973). As the trial justice pointed out, defense counsel had merely "look[ed] around the room and s [aw] thirty people [he was] not happy with," and, instead of properly targeting his motion to the *entire venire* from which the panel was drawn, he asked the court to dismiss the *particular panel* sitting in that particular courtroom. The defendant had no guarantee that the next panel selected from the venire would not have the same composition; indeed, according to defendant's logic, counsel could have continued asking for dismissals until he finally found a panel that satisfied him. This is not the function of the Sixth Amendment cross-section requirement.
>
> We previously have held that "[a]n accused has no right to demand that members of his race be on the jury which tries him." Clark, 112 R.I. at 275, 308 A.2d at 795. Accordingly, we consistently have upheld the refusal of a trial justice to order a new jury panel when, as here, the basis of the objection was that members of a defendant's race were not adequately represented in a particular panel of assembled jurors. State v. Perry, 725 A.2d 264, 268 (R.I.1999); Gaines, 528 A.2d at 308-09; Clark, 112 R.I. at 275, 308 A.2d at 795. We reach the same result here.

(State v. Sosa, 839 A.2d at 527-29.)

The State would most respectfully suggest that this comprehensive and persuasive analysis of Petitioner's "jury panel" contention, cannot in any way be characterized as an "unreasonable application of *** clearly established Federal law, as determined by the Supreme Court of the United States" (28 U.S.C. § 2254 d(1)).

**4. Ground Four**

Petitioner next argues that the "trial court's denial of the motion for a new trial was against the weight and sufficiency of the evidence" (*Petitioner's Motion for Habeas Corpus Under 28 U.S.C. 2254* at 5). This factually intensive inquiry, however, simply does not appear to be cognizable in habeas corpus. *See* Rodriguez v. Maloney, 299 F.Supp.2d 1, 2 (D.Mass. 2004)(rejecting in habeas corpus action petitioner's assertion that state court had erred in denying his new trial motion, as "[a] federal court reviewing a habeas petition is concerned only with the sufficiency of the evidence, not its weight"). In any event, the State would respectfully suggest, the Rhode Island Supreme Court's denial of this new-trial-motion claim was, as that Court determined (States v. Sosa, 839 A.2d at 529), quite justified, and did not amount to an "unreasonable application of *** clearly established Federal law, as determined by the Supreme Court of the United States" (28 U.S.C. § 2254 d(1)(.

### 5. Ground Five

The Fifth and final ground raised by Petitioner – "ineffective counsel in not notifying Mr. Sosa of a direct appeal from the State Court to the Federal Court, thereby allowing over twelve months to pass [] while giving the impression that the appeal was ongoing" (*Petitioner's Motion for Habeas Corpus Under 28 U.S.C. 2254* at 5-6) – is concededly unexhausted (*id.*). Inasmuch as this unexhausted claim would render Sosa's instant habeas petition a "mixed" one, the State would respectfully suggest that Petitioner be requested to voluntarily delete this claim from his Petition, as "federal district courts may not adjudicate mixed petitions for habeas corpus" (Rhines v. Webber, 2005 WL 711587, ___ U.S. ____, 125 S.Ct. ____ (2005)).

## D. No Need For Evidentiary Hearing

Given the nature of his habeas claim, petitioner is in no way entitled to an evidentiary hearing in this case. In enacting the AEDPA, Congress intended to curtail the number of evidentiary hearings held in federal habeas cases. *See* Campbell v. Vaughn, 209 F.3d at 286; Williams v. Taylor, 529 U.S. 420, 436, 120 S.Ct. 1479, 1490 (2000). An evidentiary hearing would be particularly inappropriate in this case because 1) the Rhode Island state courts have *already* provided petitioner with a full and fair airing of his grievances,[3] and 2) the state courts made detailed factual findings on the merits of petitioner's claims, findings which are presumptively binding on this Court in the face of petitioner's failure to present any clear and convincing evidence in rebuttal thereof. A further hearing is therefore totally unwarranted. *See* Campbell, 209 F.3d at 287 (inappropriate to hold evidentiary hearing where state courts have already made findings of fact which petitioner has failed to rebut); Dias v. Maloney, 156 F. Supp. 2d at 124 (same); Edwards v. Murphy, 96 F. Supp. 2d at 49-50 (same).

## **Conclusion**

For the foregoing reasons, the State respectfully requests that petitioner's habeas petition be denied and dismissed on all counts with prejudice.

---

[3] *See* Williams, 529 U.S. at 437, 120 S.Ct. at 1491 ("Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings."); Murphy v. Johnson, 205 F.3d 809, 815-16 (5th Cir.) (federal evidentiary hearing is appropriate only when state courts have *not* afforded petitioner a full and fair evidentiary hearing), *cert. denied*, 531 U.S. 957, 121 S.Ct. 380 (2000).

Respectfully submitted,

**STATE OF RHODE ISLAND**
By its attorneys,

**PATRICK C. LYNCH**
**ATTORNEY GENERAL**

**AARON L. WEISMAN # 4438**
Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
(401) 222-2995 (fax)

Dated: April 13, 2005

**CERTIFICATION**

I hereby certify that on the 13th day of April, 2005, I placed a copy of the within document in the U.S. mail, postage prepaid, to Francisco Sosa, Pro-Se, at his last known address of Adult Correctional Institution, P.O. Box 8273, Cranston, RI 02920.

(A)

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, Sc. SUPREME COURT

STATE OF RHODE ISLAND

v. **No. O1-184-C.A.**
(Ind. No. P1/OO-1286AG)

FRANCISCO SOSA

---

On Appeal from Judgments of Conviction and Sentence
Entered in the Superior Court of Providence County

---

# BRIEF OF THE DEFENDANT-APPELLANT

George J. West, Esq. #3052
One Financial Plaza – Ste. 1500
Providence, RI 02903
401-861-9042

## TABLE OF CONTENTS

TABLE OF CONTENTS ........ 2

TABLE OF AUTHORITIES ........ 3

QUESTIONS RAISED ........ 5

KEY TO THE TRANSCRIPT ........ 6

TRAVEL OF THE CASE ........ 7

STATEMENT OF FACTS ........ 8

I. ADMISSION OF THE PRIOR RECORDED TESTIMONY OF ANTONIO GONZALEZ WAS ERROR ........ 19

II.THE TRIAL JUSTICE ERRED IN REFUSING TO INSTRUCT THE JURY ON THE OFFENSE OF MURDER IN THE SECOND DEGREE AND INSTEAD INSTRUCTING ONLY ON THE OFFENSE OF MURDER IN THE FIRST DEGREE. ........ 27

III. DENIAL OF THE MOTION TO DISMISS THE JURY PANEL FOR SYSTEMIC EXCLUSION OF MINORITIES WAS ERROR AND DENIED THE DEFENDANT A FAIR TRIAL ........ 35

IV. TRIAL COURT'S DENIAL OF THE MOTION FOR A NEW TRIAL WAS AGAINST THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE. ........ 39

CONCLUSION ........ 42

CERTIFICATE OF SERVICE ........ 43

## TABLE OF AUTHORITIES


### Statutes

R.I.G.L. 1956 (1994 Reenactment) § 12-17-14 .......... 28

### Other Authorities

U.S. Census Bureau, 2000 Census of Population, Public Law 94-171 Redistricting Data File. Updated every 10 years. http://factfinder.census.gov. .......... 37

### Rules

R.I. Rules of Evidence Rule 804 (a) .......... 20
Superior Court Rules of Criminal Procedure Rule 31(c) .......... 28, 30

### Constitutional Provisions

R.I. Const., Art. I. Sec.10 .......... 20

### Rhode Island Cases

State v. Cipriano, 430 A.2d 1258 (RI. 1981) .......... 30
State v. Fenik, 45 RI. 309, 315, 121 A. 218, 221 (1923) .......... 33
State v. Amazeen, 526 A.2d 1268, 1271 (RI. 1987) .......... 33
State v. Bleau, 668 A.2d 642, 646 (R.I. 1995) .......... 40
State v. Brown 744 A2d 831,835 .......... 23
State v. Brown, 549 A.2d 1373, 1377 (RI. 1988) .......... 31
State v. Brown, 744 A.2d 831 .......... 21, 23, 28, 33
State v. Butler, 107 RI. 489, 495-496, 268 A.2d 433, 436 (1970) .......... 32
State v. Campbell, 691 A.2d 564, 572 (RI. 1997) .......... 33
State v. Cipriano, 430 A.2d 1258 (R.I. 1981) .......... 28
State v. Clark, 112 R.I. 270, 275, 308 A.2d 792, 795 (1973) .......... 38
State v. Clark, 603 A.2d 1094, 1096 (R.I. 1992) .......... 40
State v. Crough, 89 RI. 338, 152 A.2d 644 (RI.1959) .......... 33
State v. Dordain, 566 A.2d 942 (RI. 1989); .......... 31
State v. Gaines, 528 A.2d 305, 308 (R.I. 1987) .......... 38,39
State v. Grabowski, 644 A.2d 1282, 1285 (RI. 1994); .......... 31,33
State v. Guzman, 752 A.2d 1 (RI. 2000) .......... 35
State v. Hockenhull, 525 A.2d 926, 930 (RI. 1987) .......... 31
State v. Johnson, 116 R.I. 449, 457, 358 A.2d 370, 375 (1976) .......... 38
State v. Messa, 594 A.2d 882 (RI. 1991) .......... 31
State v. Muir 432 A.2d 1173 (RI. 1981) .......... 31
State v. Myers, 115 RI. 583, 591, 350 A.2d 611, 615 (1976) .......... 33
State v. Nunes, 788 A.2d 460, 464 (R.I. 2002) .......... 28
State v. Oliveira 774 A2d 893 (R. I.,2001) .......... 21
State v. Otero, 788 A.2d 469. (R.I. 2002) .......... 40
State v. Ouimette110 R.I. 747, 755, 298 A2d 124, 139 (1972) .......... 23,24
State v. Page, 104 RI. 323, 334, 244 A.2d 258, 264 (1968) .......... 33
State v. Prout, 115 R.I. 451, 455, 347 A.2d 404, 406 (1975) .......... 23
State v. Raposa 100 RI. 516, 217 A.2d 469 (1960) .......... 31
State v. Sundel, 121 RI. 638, 402 A.2d 585 (1979) .......... 28,30
State v. Walsh, 113 RI. 118,318 A.2d 463 (1979) .......... 28,30
State v. Yates, 571 A.2d 575, 577 (RI. 1990) .......... 31

## United States Supreme Court

Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382,65 L.Ed.2d 392 (1980) ..... 31
Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) ..... 36
Keeble v. United States, 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973) ..... 31
Ohio v. Roberts, 948 U.S. 56, 65-66, 100 S.Ct. 2531, 2538-39, 65 L.Ed.2d 597, 607-08 (1980) ..... 20
Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) ..... 36, 38

## Other Federal Cases

Belton v. United States, 382 F.2d 150, 155 (D.C.Cir. 1967) ..... 32
Driscoll v. United States, 356 F.2d 324, 327 (5th Cir. 1966) ..... 32
Rease v. United States, 403 A.2d 322 (D.C.App. 1979) ..... 32
State v. Brown, 744 A.2d 831 (R.I. 2000) ..... 21, 24
United States v. Corner, 421 F.2d 1149, 1154 (D.C.Cir. 1970) ..... 32
United States v. Mann, 590 F.2d 361, 368 (1st Cir. 1978). ..... 24,25
United States v. Warren, 984 F2d 325 (9th Cir. 1993) ..... 29

## Cases

Birdsongv. State, 231 S.E.2d 813 (Ga.App. 1976) ..... 32
Pointer v. Texas, 380 U.S. 400 at 405, 85 S.Ct. 1065 at 1068, 13 L.Ed.2d 923 at 929.) (1965) ..... 20
Price v. State, 570 A.2d 887, 889 (Md.App. 1990) ..... 32

**QUESTIONS RAISED**

I. DID THE TRIAL JUSTICE ERR IN PERMITTING THE STATE TO INTRODUCE THE PRIOR RECORDED TESTIMONY OF ANTONIO GONZALEZ?

II. DID THE TRIAL JUSTICE ERR IN REFUSING TO INSTRUCT THE JURY ON THE OFFENSE OF MURDER IN THE SECOND DEGREE. AND INSTEAD INSTRUCTING ONLY ON THE OFFENSE OF MURDER IN THE FIRST DEGREE?

III. DID THE TRIAL JUSTICE ERR IN SUMMARILY DENYING THE DEFENSE MOTION TO DISMISS THE JURY PANEL DUE TO THE SYSTEMATIC EXCLUSION OF MINORITIES THEREFROM?

IV. DID THE TRIAL JUSTICE ERR IN FAILING TO GRANT THE MOTION FOR NEW TRIAL WHERE THE WEIGTH AND THE SUFFICIENCY OF THE EVIDENCE WERE AGAINST THE VERDICT?

## KEY TO THE TRANSCRIPT

The transcript in this matter consists of three volumes, referred to herein as follows:

| | |
|---|---|
| Tr. Volume I (Tr. I) | Transcript of hearing on bail and motion to suppress identification testimony on May 30, 2000, pp. 1-176. |
| Tr. Volume II (Tr. II) | Transcript of commencement and continuation of second jury trial on October 24, 25, and 26, 2000, pp. 1-275. |
| Tr. Volume III (Tr. III) | Transcript of continuation and conclusion of jury trial on October 26, 27, 30, and 31, 2000; hearing on motion for a new trial on November 10, 2000; and sentencing on January 16, 2001, pp. 276-497. |
| Tr. (June 20-26, 2000) | Transcript of Antonio Gonzalez which was read to the Jury in the Second Trial the lower court ruled that Mr. Gonzalez was unavailable to testify. |
| Tr. (June 26, 2002) | This is actually a transcript of a ruling the trial justice made in the first trial relative to charging the jury on second degree murder. At the second trial the Court referred by reference to this prior ruling in again denying the defense motion to include the charge. The date of this ruling was 6/26/00. |

## TRAVEL OF THE CASE

Indictment No. P1/00-1286AG, filed in the Providence County Superior Court on April 5, 2000, charged the appellant, Francisco Sosa, with the murder of Hugo Andino, in violation of R.I.G.L. 1956 (1994 Reenactment) §11-23-1 (Count 1) and with carrying a pistol without a license, in violation of R.I.G..L. 1956 (1994 Reenactment) § 11-7-8(a) (Count 2).

A combined hearing was held, on May *30,* 2000, on Mr. Sosa's motion for bail and to suppress identification testimony. An initial trial before Krause, J., held in June of 2000, ended in a mistrial when the jury was unable to reach a unanimous verdict.'[1] A second trial was had, Krause, J., again presiding, on October 24-31, 2000, at the conclusion of which the jury returned verdicts of guilty on both counts. Mr. Sosa's motion for a new trial was heard and denied on November 10, 2000. On January 16, 2001, he was sentenced to the mandatory term of life imprisonment for first degree murder, and to a concurrent ten year sentence for carrying a pistol without a license.

A timely notice of appeal was filed on Mr. Sosa's behalf on the day of sentencing, and the appeal was docketed in this Court on May 8, 2001. Participation in the prebriefing process was waived, and the matter was set down for full briefing and oral argument.

---

[1] Notes from the foreperson of the first jury, which are preserved in the Superior Court file, indicate that three of the jurors at that trial were not sufficiently convinced of the credibility of the state's three primary witnesses, who identified Mr. Sosa as the shooter.

## STATEMENT OF FACTS

Events which lead to much of the testimony in the trial of Francisco Sosa related to a barbeque or cookout which took place on July 20, 1998. Much of what occurred that day was first reported to police by Mr. Francisco Sosa himself in a police report he filed on July 21, 1998 at 2:15 in the afternoon. A day after the events of the cookout unfolded. That report was made a part of the record in the trial as a full exhibit. (Tr. III – 419 (exhibit B defendant's full) On July 20, 1998[2], according to the police report, Mr. Sosa reported that while his four-year-old son was playing in the backyard of the house next to his, he witnessed through the window a ten year-old male, who hangs around his next-door neighbor's house, holding his son by the throat. Mr. Sosa reported that he went downstairs in response to that and he observed the same boy holding his son by his feet dangling him over a wall. He approached the child and asked him what he was doing. Soon after one Hispanic male and female came out side and approached Mr. Sosa. They were joined by another female by the name of Wanda. Later identified at trial as Wanda Cruz. He stated that Wanda approached and punched him in the mouth causing cuts to the left upper inside of his head. He stated that the Hispanic male of medium build approached him, he was later identified as you Hugo Andino, the decedent, and threatened him with a knife. Mr. Sosa stated that he ran out of the yard to avoid the assailants and the chase began. The foregoing version is supported by testimony of Ana Puleo, also known as Kathy. She lived at 527 Cranston St. on the third-floor. Ms.Puleo is familiar with Bethzaida Vega and LaTesha Tate the witnesses for the prosecution. Bethzaida Vega lived on the first-floor in Ms. Puleo's building. Ms. Puleo

---

[2] Ms. Vega, Ms. Tate, and Ms. Cambero all testified that the cookout was a few days before July 23, 1998, although they did not know the precise date *(See, e.g.,* Tr. II- 152-53, 215). As stated the date apparently was July 20, 1998, based on a police complaint filed by Mr. Sosa

knew LeTesha Tate. LaTesha Tate lived on the first-floor. She knew Francisco Sosa. She identified him in court. (Tr.III - 405) Mr. Sosa was her neighbor in July of 1998. She recalled the early cookout. She went to look for a toy in the yard when she saw Frank was returning with a child, he was returning it to his mom at that point he said that his mother had hit him. (Tr. III - 406) She did not see Frank strike the child at any time. She identifies Mr. Sosa as Frank. She was looking for a toy in the backyard when she saw him. At that moment when he was explaining to the other women at the cookout that he had not hit the child they all came upon him. She identified three or four women. She identified them as Erica, LaTesha, Bethzaida and Wanda. They came upon him and they took a necklace or something off him. She stated Mr. Sosa did not strike any of these women. He was blocking as they were hitting him, three women were hitting him. Hugo Andino began coming towards Mr. Sosa with a knife and she yelled "look out" and the women there said **kill him**. Ms. Puleo stated Mr. Sosa was a good neighbor. She recalls that Wanda said to kill him (Tr. III-408)

During the foot chase, after a time the Hispanic male subject, Hugo, continued the hunt for Mr. Sosa in his vehicle and chased Mr. Sosa in the vehicle while Mr. Sosa was on foot.

Mr. Sosa reported that at some point a patrol car arrived whereupon he related what happened to him. A patrol officer gave him a ride and recommended that Mr. Sosa make a report at central-station. Thus the next day Mr. Sosa did so. In that report Mr. Sosa stated clearly that he has had **a constant problem with the people next-door**. He stated that he tries to mind his own business. He stated that **he was afraid to go home**. He was advised by police to seek a restraining order. This report states that it was sent to the community police and the Housing Authority. This report was filed just days before the alleged incidents which led up to

---

on July 21, 1998, concerning events that had occurred the day before (Tr. III-365).

the death of Hugo Andino. [3]

LaTesha Tate, age 21 at the time, was the first civilian witness called for the prosecution, she testified that she did not work and lived at 527 Cranston Street, Providence, RI. She lived in Apt. One, on the first floor. She lived there for a year, The apartment was adjacent to the apartment of Bethsiada Vega also on the first floor of the same structure. Ms. Tate described her apartment's window layout, which would become important later. She has three windows in front, one window on the side, and one small kitchen window. Ms. Tate described the cookout which occurred on July 20, 1998. At this party she relates information concerning an incident[4]; where Mr. Sosa, known to her as Machina, was at the cookout and in a dispute with a female attendee known as Wanda. She knew Mr. Sosa because she saw him frequently as a person who lives next door. (T. 116)

LaTesha Tate was present at the barbeque and while she states she had not witnessed the events, she states that Mr. Sosa was said to have hit Wanda's son. LaTesha while confirming the dispute which she states arose between Wanda and Mr. Sosa also testifies that she did not know about Hugo Andino chasing Mr. Sosa with the knife until after she had heard that in court (Tr. II -116-117) LaTesha testifies that no one told her about Hugo Andino chasing Mr. Sosa with a knife that night. She states that even in the police car on the ride down the police station after Mr. Andino died when she accompanied two other woman to give a report, it did not come up. The day after the cookout no one ever said anything about Hugo chasing Francisco with a knife. (Tr. II-120) She also testified that she cannot recall Hugo telling her that he had a dispute Mr. Sosa. Ms. Tate states that Ms. Vega never told her about the knife chase and Erica Cambero failed to mention it despite the fact that they were all together before and times after it had

[3] A portion of that report was read by Detective O'Mara. (Tr.III- 366).
[4] It should be noted that Ms. Tate bears a tattoo with the name of the decedent, Hugo (Tr. II - 124).

occurred and despite the fact Ms. Tate herself described a problem between Mr. Andino and Mr. Sosa. (T. 117-120) (See T. 125)

Ms. Tate, next describes being home on the day Mr. Andino was shot, on July 23, 1998. She was in her apartment drinking beer and playing cards with Ms. Cambero, Mr. Andino, and another man. She states she had her front shades drawn but that she heard Mr. Sosa's voice. He had knocked at the post separating her apartment from Ms. Vega's. He called out for Ms. Vega. Ms. Tate viewed him through the peephole of her apartment. Ms. Vega was not home at the time. Despite hearing this all perfectly well, no one at the card game was apparently concerned enough to call the police that Mr. Sosa had presented himself. (Tr. II-76-79). What is described as two minutes later Ms. Tate says that Mr. Sosa speaking through the side window of the Tate apartment, pointed in the direction of where Mr. Andino and others were seated and said to Mr. Sosa's wife, who we are given to understand is on the sidewalk near him, "I am going to get him" (Tr. II 77-81). That is apparently all that transpired at that time. The Tate party resumes its activities. The police are not called, no apparent evasive action at all is undertaken as a result of the reported exchange.

Sometime later Ms. Vega returns together with her children. Ms. Vega stopped at Ms. Tate's who informed her that Mr. Sosa had been looking for her. She does not inform Ms. Vega about the statement attributed to Mr. Sosa through the side window. (Tr. II -130) Ms. Tate says that Ms. Vega's two year old Anthony was in front of the Tate-Vega residence, placed there by Ms. Vega. Ms.Vega went round the alley to collect her older child who was playing basketball in the rear. Notwithstanding the reported Sosa statement Ms. Tate does not retrieve Anthony from the front yard. Rather she reports hearing Ms. Vega speak with someone in the alley between her house and the Sosa home. She reportedly hears Ms. Vega speaking with Ms. Sosa,

wife of Francisco, apparently loud enough to be heard in the residence, and topically related to the ongoing issues between the parties. It is sometime shortly after Ms. Vega's entry into the alley and starting this exchange that she apparently announces: "He's coming and He's got a gun." Ms. Tate says that she made a fast glimpse out the side window and sees the person she describes as Machina coming over the fence, but she sees nothing in his hand. (Tr. II -148). Here it should be noted that another witness, Erica Cambero, does not report Mr. Sosa coming from the alley way but rather reports him coming around the far side of his house down a driveway. (Tr.II- 229,264) A totally different area and which neither Ms. Tate nor Ms. Vega would have been able to view him in the manner related. Through out this time of Ms. Vega's initiation of an exchange with apparently the wife of Mr. Sosa, she, Ms. Tate did not call the police. (Tr. II- 133) She later acknowledges that though she was the one who did call police from her home phone to report the shooting, she did not do so until the shots were fired and that she did not see the actions she was relating to the 911 operator as she was in the house away from the unfolding events. (Tr. II – 135)

Ms. Tate reports that there were no statements obtained at the scene from her or Ms. Vega or Ms. Cambera, these were done at the station. The three rode in the same patrol car to the station. There appears to have been considerable conversation between the women although some deny that. Ms. Tate denies any conversation. (Tr. II- 139) Ms. Tate also clarified that she did not see Mr. Sosa leave in a car as she told police as she was not in a position to see the same. (Tr. II -143).

Bethzaida Vega, the next witness, the mother of two sons, was the host of the afternoon cookout in the backyard of her apartment building at 527 Cranston Street in Providence, to which as noted a number of her neighbors and friends and their children were present (Tr. II-150-53).

In attendance were Ms. Vega's good friend Wanda Cruz and her son; LaTesha Tate and her children, who lived in the other first floor apartment of the building; Ms. Tate's friends Erica Cambero and Hugo Andino; and several others (Tr. II 153). Sometime during the cookout, she relates Ms. Cruz's son had an argument or altercation with the boy who lived next door, at 531 Cranston Street, who was the son of the appellant, Francisco Sosa, known to his neighbors by the nickname "Machina" -- Spanish for "machine" (Tr. II-153-54). Ms. Vega testified that Ms. Cruz's son reported that Mr. Sosa had struck him, which then prompted an argument between Ms. Cruz and Mr. Sosa (Tr. II-154). Ms. Vega said that the argument between the two adults became physical, with them pushing and hitting each other (Tr. II-157-159). Ms. Vega intervened and took Ms. Cruz inside (Tr. II-159).

Next her attention is drawn to July 23, 1998 when she comes home and stops at Ms. Tate's. In her version she is warned of a threat being made against Mr. Andino, despite Ms. Tate saying she had not mentioned the reported statement by Mr. Sosa. (Tr. II - 162) Ms. Vega's version of events, unfolds with urgency, first she is apprised of the Sosa statement. She is also told by the card playing Ms. Tate to get the kids, come inside and lock the doors. It must be remembered that despite this admonition, Ms. Vega leaves the front of the house to the left to the alley, leaving the two year old Anthony still outside.[5] She then reports discussing with Ms. Sosa why Mr. Sosa would be upset and be threatening Hugo Andino. (Tr. II - 162) All three reporting witnesses at least agree on one point, it is not until Ms. Vega enters the alley way and says whatever it is she says that the next event unfolds. Ms. Vega says that following her oral encounter with Ms. Sosa, Mr. Sosa appears straddling a fence dividing the two properties. She next runs retracing her steps and calling out to LaTesha to lock the door, he's coming with a gun. She traverses the front of the house, where Anthony is still there, heading to the other side to

collect Jonathan, who is playing basketball in the back of the Tate-Vega house. She reported that she had observed Mr. Sosa wearing a Red Sox shirt. (Tr. II-165,166).

As she was taking Jonathan down the far side of the Tate-Vega home (Tr.II -166) that is when Ms. Vega heard the shots and stood there with Jonathan, grabbed him tight and stood right there at that point. She was on the side of her house, the side of the house with the alley would be the other side (Tr.II -167) Her other son was on the porch. She got to the second window for kitchen she stood there and heard LaTesha say he was shot. She returned to the house and found Hugo was jumping up and down saying its burning.

Ms. Vega was questioned about her knowledge of Gonzalez bus lines. She stated she knows where it is. It is to the right when you're looking at the front door of her house (T. 173). At the time of the shooting she was standing on that side with her son. On the side which was closer to Gonzalez bus lines. On the side one would have to pass to get there. This is an important fact as the gun used in the shooting would later be recovered on the Gonzalez bus line property.

Additional testimony was had from Erica Cambero who, a member of the Tate card game, she lives at 134 Hanover St., she was 24 years old in 1998, testified that she witnessed the heated altercation between Mr. Sosa and Ms. Cruz at the cookout (Tr. II-216). She said that during the argument, Hugo Andino went inside and came back with a kitchen knife with which he chased Mr. Sosa from the property; he came within ten or fifteen feet of Mr. Sosa while brandishing the knife at Mr. Sosa. (Tr. II-220-21) She recalls playing cards around six o'clock at night from with Hugo and LaTesha and two other friends. She recalls Mr. Sosa banging on Bethzaida's door calling Bethzaida, Bethzaida. She next states that Mr. Sosa at the side window in the living room boosted himself up and said I'm going to get you into the window in Spanish. He pulled himself up and said it looking in Hugo's direction (Tr.II- 225) Then Bethzaida came

---

[5] We know he is still outside because Mr. Andino is said later to go to bring him inside.

home and they told her that Mr. Sosa had been at the house and she went to the alley. At this point they hear Bethzaida yell he's got a gun. They went out side to get Bethzaida's two-year-old son who was on the front porch, his name is Anthony. As they went out the door to get Anthony, Hugo went out first, Erica went out second and LaTesha went out. Apparently according to Ms. Cambero, Ms. Tate went back in. When Ms. Cambero saw the individual she state's is Mr. Sosa coming out the driveway. As noted above a location for the alleged shooter totally different from the other two witnesses. (Tr.II- 229) She states he was not coming up the alleyway she states he was coming down the driveway which is right next to 531 Cranston St. which is on the far side. Ms. Cambero was on the porch standing with Hugo and she saw the gun go off. She describes the event as the shooter had his hand behind his back and just came pulled it out, pulled the gun out and shot (Tr.II- 230) The shooter was 25 ft. away when she first saw the gun. He allegedly came out, he had his hand behind his back, and then just pulled out straight and shot. On cross Ms. Cambero agreed she had limited contacts with Mr. Sosa and had never spoken to him.

She did not know what direction the shooter took off though she viewed all his apparel and features and he was 20 feet away. (Tr.II- 271) She volunteered herself as a witness (Tr.II- 272) There were two teenagers in the house who's name she did not know. Police did not interview these men. They were inside the house but they didn't approach the police to offer information. They didn't really get involved. (Tr.II- 272) Erica Cambero reports that with regard to the ride to the Police Station that with respect to the three witnesses it was all completely quiet in the patrol car (T. 273) As noted after the shot, Mr. Andino complained of a burning sensation, and came inside and collapsed on Ms. Tate's floor (Tr. II-233-34). The rescue squad arrived soon after (Tr. II-235). Mr. Andino was taken to the hospital, where, despite

emergency efforts, he passed away later that night from internal bleeding, according to Chief Medical Examiner Elizabeth Laposata (Tr. II-56-59; Tr. III 339)

No live testimony placed Mr. Sosa in the parking lot of Gonzalez Taxi. Mr. Gonzalez, a homeleass man employed by Gonzalez Taxi, was in a nearby liquor store as the shooting took place. (Tr. Former Testimony 1). He saw a man running from the lot. (Tr. Former Testimony 2). He did not see the man's face, and made no identification. (Tr. Former Testimony 3). Over defense objection, testimony given at the first trial by state's witness Antonio Gonzalez was read to the jury, since Mr. Gonzalez was not located to testify in this trial (***(See) generally,*** Tr. III-379-97, 401). Detective O'Mara was responsible for notifying the state's witnesses that their testimony would be required in the upcoming trial. He was the only member of the police department who attempted to locate Mr. Gonzalez (Tr.III-381, 389). On October 19, **the Friday preceding the second trial**, O'Mara began the search. (Tr.III-382). Checks of the prison, arrest and hospital records were made, but turned up nothing. (Tr.III-383). Not surprisingly, checks of the post office, gas and electric companies, seeking the homeless man's mailing or billing address also proved fruitless. (Tr.III-383, 384). O'Mara obtained the address of a boarded up house from a former employer as Gonzalez's residence. Despite the witness' homeless status, the detective did not conduct a check of this location. (Tr. II-387).

At the first trial, Mr. Gonzalez testified that as he was leaving a liquor store on the night of July 23, 1998, he saw a man, whom he did not know, run into a nearby parking lot with a gun and exit the lot without the gun. Mr. Gonzalez located the gun in the parking lot and the police were called (Tr. III-401). At this trial, a transcript of Mr. Gonzalez' testimony from the first trial was read to the jury, but the stenographer at the second trial did not re-transcribe this testimony (Tr. III-401). Instead, a copy of the transcribed testimony was made an exhibit for identification only,

and is located with the full exhibits with the Superior Court file, now located in the Supreme Court Clerk's Office.

The trial judge determined these attempts reasonable and declared Mr. Gonzalez unavailable. (Tr.III- 394). Mr. Gonzalez had been located and testified at the first trial. That former testimony was read to the jury at the second trial, despite timely objection by counsel. (Tr. III- 379).

Police detectives recovered a .38 caliber revolver which had been located by Mr. Gonzalez. He found the gun in the parking lot of Gonzalez Taxi & Bus. (Tr.III-301). A test for fingerprints by Detective Renzi turned up nothing. (Tr.III- 308). A bullet recovered by the medical examiner was linked to that particular revolver in expert testimony offered by Mr. Hathaway. (Tr.III- 295-296).

The gun and a bullet recovered from Mr. Andino's body were transported to the Rhode Island State Crime Laboratory (Tr. III-310). Robert Hathaway, the crime lab's firearms expert, testified that the bullet was fired from that gun (Tr. III-295-96). Det. Kerrion O'Mara testified that efforts to locate Mr. Sosa after the shooting were unavailing (Tr. III-359-61, 368-69), and that he was not arrested until March of 2000, in New York (Tr. III-369-70). The parties entered into a stipulation that Mr. Sosa did not possess a license to carry a firearm (Tr. III-402).

A view was proposed by the state. (Tr. II-17). Counsel objected and argued that if, and only if, the scene was unaltered from its appearance on July 23, 1998, would a view be proper. (Tr.II-21). The Court agreed, and required a detective to "satisfy himself that things are the same. If they're not, we're not taking a view." (Tr.II-24-25).

Detective Renzi was sent to inspected the scene. (Tr.II-25). He testified that "[I]n 1998 the fence in question had been clear. There was no debris in the area. Wasn't blocked in any way. Just a fence approximately two and a half to three feet tall. Yesterday when I was at the

same location that same fence had what appeared to be doors piled up against it, nailed together, as to prevent anybody from going over that low fence."(Tr.III-304). Nonetheless, the view was conducted.

Two autopsy photographs were admitted over objection on prejudicial effect grounds. (Tr.III-327-328).

An autopsy was conducted by Dr. Callery, a visiting pathologist from Delaware; Dr. Laposata reviewed his report and testified to his conclusions (Tr. III-335).

As noted the remaining evidence was that of the three witnesses. Ms. Tate, Ms. Vega, and Ms. Cambero were all brought, in the same police car, to the station to give statements; although Tate maintained that they did not speak about the shooting on the way to the station, Vega admitted that they did (Tr.II-97, 139, 169, 201). At the station, they testified, they were placed in separate rooms where they gave statements and were each shown a photographic array of suspects (Tr. II-97-98, 172, 202, 236-37). Each of the three testified that she identified a picture of Mr. Sosa as the shooter (Tr. II-9, 172-73, 237; Tr. III-354). Together in one car, Tate, Vega and Erica Cambero rode to the police station to give a statement. To the question, "during the course of this ride there was lots of discussion about what happened," Bethzaida Vega answered, "Yes." (Tr. II-202).

Although the indictment did not specify a particular degree of murder, the Court only instructed the jury on first degree murder. The lesser included offense of second-degree murder advocated for by counsel for Mr. Sosa was discounted by the court. (Tr. III- 403, 414). The court's strong "first-degree or nothing at all" sentiments from the first trial were renewed. Incorporated by reference were arguments made by counsel in the first trial. (Tr. III- 403, 413, 414). (See Transcript of June 26, 2000 (1st Trial) -1-3)

The jury questioned the instructions, requesting explanations of second-degree murder

and third-degree murder. (Tr.III- 462). The court recited its prior first-degree instruction and refused to instruct the jury otherwise. (Tr. III-463). Although made outside the jury's presence, the trial justice incorporated arguments and decided points of objection to evidence and jury instruction from counsel's representation at the prior trial. (Tr.III- 328, 403, 413 and 414).

A judgment of conviction was returned on both counts. (Tr.III- 465). A motion for a new trial was made in a timely manner. (Tr.III- 468). Counsel argued that the judgement was not sufficiently supported by evidence capable of a jury finding guilt beyond a reasonable doubt. The motion was denied, and the current appeal ensued. (Tr.III- 477).

## I. ADMISSION OF THE PRIOR RECORDED TESTIMONY OF ANTONIO GONZALEZ WAS ERROR.

Reading Mr. Gonzalez's former testimony to the jury of Mr. Sosa's second trial violated Sosa's constitutional right to confront his accuser before a jury of his peers. At the first trial, Gonzalez testified that he found the murder weapon in the parking lot of Gonzalez Taxi and then, together with the proprietor, called the police. (Tr. III, 401). He also testified that he observed a man in that area with a gun. These are material facts which are central to the state's case against Sosa. This former testimony was admitted in the second trial despite safeguards incorporated into the Rhode Island Rules of Evidence designed to prevent this from happening. In the first trial, the jury observed this witness, his demeanor along with the content of his testimony. The jury in the second trial was denied the opportunity to make a personal observation of the witness and appraise his demeanor but instead was limited to hearing the cold record of what his previous testimony was. The first trial ended in a hung jury even though Mr. Gonzalez 's physical description of the person who came through the Gonzalez bus line parking lot was similar to that of the other three witnesses.[6] There is no question that the state offered the

[6] Bethzaida Vega had testified that on July 23, 1998, Mr. Sosa was wearing a blue or grey Red Sox shirt and blue shorts (Tr. II-165); Erica Cambera also testified that Mr. Sosa

witness against Mr. Sosa. He was offered to tie him to the weapon.

"In all criminal prosecutions, accused persons shall enjoy the right * * * to be confronted with the witnesses against them." R.I. Const., Art. I. Sec.10. This Court held, "The right of a criminal defendant to confront and cross examine witnesses, although not absolute, "is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." State v. Scholl, 661 A.2d 55 (R.I.1995), State v. Burke, 574 A.2d 1217 (R.I. 1990) (quoting Pointer v. Texas, 380 U.S. 400 at 405, 85 S.Ct. 1065 at 1068, 13 L.Ed.2d 923 at 929.) (1965)."

The Scholl Court stated "that when the declarant is not present at trial, the confrontation clause normally requires that he or she be shown to be unavailable." This language is rooted in the federal constitutional interpretations in the United States Supreme Court cases of Pointer v. Texas, 380 U.S. 400 at 405, 85 S.Ct. 1065 at 1068, 13 L.Ed.2d 923 at 929.) (1965), and Ohio v. Roberts, 948 U.S. 56, 65-66, 100 S.Ct. 2531, 2538-39, 65 L.Ed.2d 597, 607-08 (1980)."

The Rules of Evidence promulgate standards designed to ensure maximum protection of these fundamental considerations. R.I. Rules of Evidence Rule 804 (a), governs situations in which "the declarant is absent from the hearing and the proponent [the] statement has been unable to procure [their] attendance by process or other reasonable means." This Court recently held "that the basic litmus test of whether a witness's unavailability at trial violates the defendant's right of confrontation is whether the state has made a "good faith" effort to secure that witness's presence at trial. State of Rhode Island v. Brown 744 A2d 831, 835 (R.I. 2000) Citing Roberts, 448 U.S. at 74, 100 S.Ct. At 2543, 65 L.Ed.2d at 613 (quoting Barber v. Page, 390 U.S. 719, 724-725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 260 (1968) ("[A] witness is not

---

was wearing a Red Sox jersey (Tr. II- 234-35).

'unavailable' for the purposes of the * * * exception to the confrontation requirement unless the prosecutional authorities have made a good-faith effort to obtain his presence at trial")).

The Court equated "good faith" with the reasonableness of the state's efforts to produce the declarant at trial. Id. "The lengths to which the prosecution must go to produce a witness * * * is a question of reasonableness." Id. (quoting California v. Green, 399 U.S. 149, 189 n. 22, 90 S.Ct. 1930, 1951 n. 22, 26 L.Ed.2d 489, 514 n. 22 (1970) (concurring opinion))." State v. Brown, 744 A.2d 831 (R.I. 2000). This reasoning provides that only after an unsuccessful good faith effort to secure the witness' presence at trial shall former testimony be admissible. State v. Brown, 744 A.2d 831 (R.I. 2000), State v. Oliveira, 774 A.2d 893 (R.I. 2001).

In the Brown case, the state sought to admit into evidence an out-of-court statement of Jermaine Bell. To establish Bell's unavailability, the state called Sgt. Moreau to testify, "that on April 24, 1996, at the start of trial, he personally served Bell with a subpoena directing him to appear in court and testify on April 29, 1996. In addition to serving the subpoena, the state brought Bell to the Family Court and canceled an active capias warrant issued by that court. Sgt. Moreau also testified that he orally instructed Bell to appear in court on that date. Sgt. Moreau went to Bell's apartment, spoke with relatives and neighbors, attempted twenty to twenty-five times to page him at the number Bell provided. Sgt. Moreau enlisted the help of the Narragansett, Pawtucket and Providence Police, the Attorney General's juvenile unit, Bell's probation officer, the Department of Children, Youth, and Families, and the state training school, as well as several area hospitals. All these inquiries proved fruitless. [T]he trial justice took instant remedial action by issuing a bench warrant for Bell's arrest when it became apparent that [he] would not be present at trial." State v. Brown, 744 A.2d 831.

In State v. Oliveira 774 A2d 893 (R. I.,2001), the state sought to admit into evidence an

out-of-court statement of Lenneth Fisher. "To establish Fisher's unavailability, the state called Det. Altomari to testify, that a week or two before the trial, a warrant had been issued for Fisher's arrest. Det. Altomari also testified that, since the trial's start, a Det. Finnegan had been searching for Fisher and that he himself believed that other members of the police department also were looking for Fisher. The trial justice found that Fisher was unavailable." Oliveira, 744 A.2d 893 (R.I. 2001).

In the present case, the state sought to admit into evidence an out-of-court statement of Mr. Gonzalez. To establish Gonzalez's unavailability, the state called Det. Kerrion O'Mara. Det. O'Mara testified, at a hearing outside of the presence of the jury, that a week before this trial commenced, he had attempted to locate Mr. Gonzalez; he said that he sought assistance from the people at Gonzalez Taxi, who had helped him find Antonio Gonzalez before the previous trial (Tr. III, 382-83). Det. O'Mara said that he was directed to a house where the taxi company people believed that Mr. Gonzalez lived, but that the house turned out to be vacant and boarded up (Tr. ITT, 382-83). Det. O'Mara said that he had attempted to find Mr. Gonzalez by contacting area hospitals, shelters, the ACI, the post office, and utility companies, but because the detective did not have a birth date and the name was such a common one, his efforts were unsuccessful (Tr. III, 383-85). It appeared that Det. O'Mara did not actually pursue any leads concerning people named Antonio Gonzalez, stating that, "it was kind of hard for them [the institutions with whom he checked] to give me an address because of a familiar name." (Tr. III_, 384). Det. O'Mara said that he was told that Antonio Gonzalez was living on the street, so each day during the less than one week period prior to the trial. He had gone to the Cranston Street area which he was told Mr. Gonzalez frequented, attempting to find him (Tr. III-384-85). He testified that he left his card and pager number with people who were familiar with Mr. Gonzalez and with the

people at Gonzalez Taxi who said that they generally saw him every couple of days (Tr. IIII-384-85).

Det. O'Mara acknowledged on cross-examination that after the Mr. Gonzalez testified at the first trial, he did not inform him that the subpoena remained in full force and effect nor of the consequences of failing to appear should his presence be needed again (Tr. III, 386). He also said that after the first trial ended in hung jury, he made no attempts, during the intervening months, to make contact with Mr. Gonzalez and notify him that he would be asked to testify at a second trial (Tr. III, 387). Just before the second trial, he looked only once for Mr. Gonzalez at the vacant home to which he was directed by the people at Gonzalez Taxi (Tr. III, 387). Never, since the case was reached for trial again, did Det. O'Mara ask other police officers, especially those assigned to the Cranston Street area, to be on the lookout for Mr. Gonzalez (Tr. III, 389).

No other officer, detective or division of the police department was notified or enlisted to help O' Mara in his search. Det. O'Mara was searching for a homeless man. (Tr.III-382-382) He checked with the post office, Providence Gas and Narragansett Electric for a billing or mailing address. The address of a boarded up house where the witness was known to stay was obtained from a former employer. Despite the witness' homeless status, the detective conducted no further check of this location. (ie. to see if it was being used by homeless people.)

In State v. Brown 744 A2d 831,835 this Court held, "Whether the state has exercised reasonable diligence in securing the presence of a witness is assessed on a case-by-case basis. State v. Prout, 115 R.I. 451, 455, 347 A.2d 404, 406 (1975); State v. Ouimette, 110 R.I. 747, 755, 298 A.2d 124, 130 (1972). The question of whether the state's efforts were reasonable in attempting to locate a missing witness is left to the sound discretion of the trial court, and "that discretion will not be interfered with upon appeal unless an abuse thereof is affirmatively

shown." Ouimette, 110 R.I. at 755, 298 A.2d at 130. The burden is on the defendant to "affirmatively show that the trial justice abused his discretion." Prout, 115 R.I. at 456, 347 A.2d at 406." State v. Brown, 744 A.2d 831 (R.I. 2000). In another case where the State sought to introdude prior testimiony, State v. Ouimette110 R.I. 747, 755, 298 A2d 124, 139 (1972)., the witness, Donna St. Rock, spoke to the prosecutor a few days before trial, and indicated her willingness to testify at trial, as she had at the bail hearing of the two codefendants. However, when the witness failed to show up for an appointment with the prosecutor the next day, he directed the Providence police to take her into custody. The Providence Police Department made extensive efforts to locate St. Rock, including putting out a nation-wide missing person report, and sending her photograph and description to all police departments in Rhode Island and nearby New England. An officer from the Providence Police Department also went to Boston, where he traced St. Rock to a house and several area nightclubs. From there, the officer was able to track St. Rock though Maryland, Washington, D.C., Florida, and back to New England; he was still searching for her at the time of trial. This Court held that such intensive efforts to ***find*** the witness, both with and without the State of Rhode Island constituted the due diligence required before a witness may be declared unavailable.

Inherent in the duty required by Rule 804 to make efforts to procure the presence of an absent witness is the concomitant duty to make diligent efforts to ***prevent a witness from becoming absent.*** United States v. Mann, 590 F.2d 361, 368 (1st Cir. 1978). There, the witness, Joanne Shine, was arrested with the defendant attempting to smuggle cocaine from Peru into Puerto Rico. Subsequently, the government took a deposition from Shine, secured her agreement to appear at Mann's trial, dismissed the charges against her, and returned her airplane tickets and Australian passport. Not surprisingly, Shine later declined to return from Australia to Puerto

Rico for Mann's trial. Nonetheless, the First Circuit Court of Appeals held, Shine did not meet the definition of legal unavailability. The government's conduct, the Court said, had contributed to her unavailability - which could have been avoided by retaining her passport -- and the government failed to make a vigorous attempt to secure her presence because it possessed her prior recorded deposition testimony. The trial court's decision to permit the introduction of Shine's prior recorded testimony was overruled by the appellate court.

In this case, the state knew, at the time of the first trial, that Mr. Gonzalez was a reluctant witness and a homeless or "street person" who potentially could be difficult to find when his appearance in court was necessary. The State ought to have taken steps to notify, identify and be able to keep in touch with its needed witnesses in the event of a mistrial or hung jury as such a happening may occur in any criminal trial. The State should have advised its witnesses that the subpoena for their attendance remains in fill force and effect until the prosecution is completed. Not only did the state here not so advise Mr. Gonzalez after his testimony at the first trial was completed, but it failed to take any prompt action to find him, in June of 2000, as soon as the mistrial was declared. Instead, knowing that the matter might not be reached again for a long stretch of time, and that Mr. Gonzalez might well be harder to find as the weeks and months wore on, the state took no action to find him at that point. To the contrary, aware that it possessed his prior testimony, the state chose to sit and wait until the eve of the second trial, months later, before making any effort at all to locate Mr. Gonzalez and inform him that his presence would again be required. While the government actions could be called proactive in United States v. Mann 590 F2d361, 368 (1st Cir. 1978), where the government secured the witness' recorded testimony, dismissed the charges against her, and returned her passport and airplane tickets to Australia, the State of Rhode Island here certainly did nothing at all to prevent

Mr. Gonzalez from becoming absent, despite the foreseeability of that outcome, given his precarious living situation. Rather, the state deliberately chose a path of inaction, knowing, as the government did in ***Mann,*** that it possessed his prior recorded testimony.

Perhaps even more compelling is what the state failed to do to locate Mr. Gonzalez once the case was reached for trial a second time. Det. O'Mara testified that he was directed by the people at Gonzalez Taxi to a particular house, which turned out to be vacant and boarded up, but that he checked for Mr. Gonzalez' presence there only once. He acknowledged that he never returned to that house, despite the fact, as defense counsel pointed out, that a homeless person was quite likely to take shelter in a vacant structure.

Although Det. O'Mara said he left his name and pager number with acquaintances of Mr. Gonzalez, it is not terribly surprising that he never heard from them. Many people in the city's poorer and minority neighborhoods have a perhaps well-founded wariness about the police department. Since Mr. Gonzalez was a reluctant witness, relying on his friends and acquaintances in the neighborhood to contact the police so they could come and force him into court ought not to be viewed as a credible, realistic or reasonable plan of action.

Moreover, Det. O'Mara testified that he never sought assistance from any other police officer in attempting to locate Mr. Gonzalez. This is in sharp contrast to the actions of the officer in Brown, who enlisted his follow Pawtucket police officers to search for Mr. Bell, as well as the Narragansett Police Department when he gained information that Bell might be spending time in that community. Det. O'Mara's inaction here is in even sharper contrast to the efforts undertaken in Ouimette, where officers of the Providence Police Department put out a nation-wide missing person report searching for the missing witness, St. Rock, and sent her photograph and description to all police departments in Rhode Island and nearby New England. Det. O'Mara, on

the other hand, did not even ask the patrol officers assigned to the Cranston Street area, where Mr. Gonzalez was known to be seen every few days, to keep an eye out for him.

Although Det. O'Mara made some personal efforts to find the witness, the totality of his efforts falls far short of the reasonable diligence required by law. Because the government did not exercise reasonable diligence in attempting to locate Mr. Gonzalez, it cannot be said to meet the legal standard of unavailability necessary to overcome Mr. Sosa's constitutional rights of face-to-face confrontation. The trial justice thus erred in finding that Mr. Gonzalez' prior recorded testimony was admissible. The error was unquestionably an extremely harmful one. Although the state had three other witnesses, days before Mr. Andino's death some of these same witnesses were goading Mr. Andino, then engaged in a knife attack on Mr. Sosa, to kill Mr. Sosa. All three -Ms. Vega, Ms. Tate and Ms. Cambero had a bias against Mr. Sosa as a result of prior interactions, and their credibility, or lack thereof caused the first jury to be unable to agree on a verdict. Mr. Gonzalez, by contrast, was a witness with no known bias against Mr. Sosa, who provided testimony crucial to the state, that is to say he was the quintessential type of witness the constitutional right of confrontation refers to. The missing witness described a man whose description was consistent with that of the three women witnesses relative to Mr. Sosa. A man who had the murder weapon immediately after the shooting. Accordingly, the error was exceedingly harmful and requires reversal of Mr. Sosa's conviction.

## II.THE TRIAL JUSTICE ERRED IN REFUSING TO INSTRUCT THE JURY ON THE OFFENSE OF MURDER IN THE SECOND DEGREE AND INSTEAD INSTRUCTING ONLY ON THE OFFENSE OF MURDER IN THE FIRST DEGREE.

Reversible error was committed by failing to instruct the jury on the elements of second-degree murder. The Grand Jury indictment charged murder. No specific degree was stated. (Tr.

Grand Jury Tapes 78). Sosa's efforts to obtain such an instruction were discounted by the court. The trial justice's strong "first-degree or nothing at all" sentiments which were expressed at the first trial were renewed. Again the trial justice made reference to arguments made in the first trial. (Tr. 403, 413, 414). The only murder instruction presented to the jurors was that of first degree.

After some deliberation, the jury had questions about lesser degrees of murder. Specifically, through the foreperson, they requested explanations of second-degree murder and third-degree murder. (Tr. 462). The trial justice simply recited his prior instruction on first degree murder and refused to instruct the jury on second-degree murder degree. (Tr. 463).

This Court has consistently held that second-degree murder is a lesser included offense to the charge of murder. "It is well settled that a criminal defendant is 'entitled - and the trial justice is required - to instruct the jury on [a] lesser included offense *** [w]hen the evidence supports a possible verdict on a lesser included offense." State v. Brown, 744 A.2d 831. (quoting State v. Messa, 594 A.2d 882, 884 (R.I. 1991) (citing State v. Hockenhull, 525 A.2d 926, 930 (R.I. 1987).

Superior Court Rules of Criminal Procedure Rule 31(c) states that:

> [t]he defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense.

R.I.G.L. 1956 (1994 Reenactment) § 12-17-14, R.I.G.L. 1956 (1994 Reenactment) § 12-17-14 provides that:

> [w]henever any person is tried upon an indictment, information, or complaint and the court or jury, as the case may be, shall not be satisfied that he is guilty of the whole offense, but shall be satisfied that he is guilty of so much thereof as shall substantially amount to an offense of a lower nature, or that the defendant did not complete the offense charged, but that he was guilty only of an attempt to commit the same, the court or jury may find him guilty of such lower offense or guilty of an attempt to commit the same, as the case may be, and the court shall proceed to sentence such person for the offense of

> which he shall be so found guilty, notwithstanding that such court had not otherwise jurisdiction of such offense.

The rule and the statute restate the common-law principle that an indictment puts a defendant on notice of all lesser included offenses necessarily included in the stated charge. State v. Cipriano, 430 A.2d 1258 (R.I. 1981); State v. Sundel, 121 R.I. 638, 402 A.2d 585 (1979); State v. Walsh, 113 R.I. 118, 318 A.2d 463 (1979).

This court has held that "The distinction between first-degree and second-degree murder is that first-degree murder 'requires proof of premeditation of more than a momentary duration and proof of deliberation whereas second-degree murder does not.'" State v. Nunes, 788 A.2d 460, 464 (R.I. 2002) quoting Brown, 744 A.2d at 838 (quoting State v. Grabowski, 644 A.2d 1282, 1285 (R.I. 1994)). "Accordingly, we have declared that 'if that premeditation is more than momentary, the murder is in the first degree and no charge on second degree murder is necessary; if it could be less, then the offense may be murder in either the first or second degree, and a charge on both must be given.'" Id. 788A.2d at 464-465, quoting Brown, 744 A.2d at 838-39 (quoting State v. Campbell, 691 A.2d 564, 572 (R.I. 1997)).

In 1993, a federal appeals court held where the jury asked a specific question about the defendant's intent (whether to hurt or to kill the victim), it was error simply to refer them to the original instruction which did not answer their query. United States v. Warren, 984 F2d 325 (9th Cir. 1993).

Premeditation is a necessary element to obtain a judgment of conviction on a first-degree murder charge. The jury asked the court for instructions on murder charges with import upon the defendant's intent. This may have been in response to the lack of testimonial evidence on premeditation. No typical evidence of premeditation such as when a defendant has retreated and returned armed, or has stalked the victim, or where the decedent died of multiple wounds, was offered in this case. In reciting its prior first-degree instruction the trial justice deprived the jury of their role to find the facts of the case.

The trial justice instructed this jury, as he did the first jury, as to the elements of murder

in the first degree (Tr. III, 403, 413-1 5); over defense objection, he refused to instruct on the lesser-included offense of murder in the second degree (Tr. III, 413-15). After deliberating for several hours, the jury sent a note, asking instruction on lesser degrees of murder; that request was refused and the instruction was given, again, only on murder in the first degree (Tr. III, 462-65)." After another few hours of deliberation, the jury returned its verdicts (Tr. III, 465).

> In Rhode Island, an indictment is deemed to charge, and put a defendant on notice of, not only the offense named, but all necessarily included offenses.

The jury asked for reinstruction on the concept of reasonable doubt, and for definitions of second and third degree murder. It was told that the offense of third degree murder did not exist in Rhode Island law, and that the issue of second degree murder was not before it. This response to a the jury was undoubtedly chilling and must be viewed as non-responsive. The court then reinstructed on first degree murder and the meaning of proof beyond a reasonable doubt (Tr. III, 462-465).

Although an accused may be on notice of all lesser-included offenses, a defendant has a right to a relevant jury instruction only upon meeting the test of what constitutes a lesser-included offense.

> [A] defendant is entitled to invoke Rule 31(c) when a lesser offense is established by the evidence adduced at trial in proof of the greater offense, with the caveat that there must also be an "inherent" relationship between the greater and lesser offense, i.e., they must relate to the protection of the same interests, and must be so related that in the general nature of these crimes, though not necessarily invariably, proof of the lesser offense is necessarily presented as part of the showing of the commission of the greater offense.

State v. Yates, 571 A.2d 575, 577 (RI. 1990), quoting United States v. Whitaker, 447 F.2d 314, 319 (D.C.Cir. 1971); see also, State v. Dordain, 566 A.2d 942 (RI. 1989); State v. Cipriano, supra; State v. Walsh, supra; State v. Raposa, 100 RI. 516, 217 A.2d 469 (1966). Second degree murder is clearly a lesser-included offense of murder in the first degree. State v. Grabowski, 644

A.2d 1282, 1285 (RI. 1994).

Once a defendant properly requests a jury instruction on a lesser included offense, a trial judge must grant the request "when the evidence supports a possible verdict on the lesser included crime.' State v. Messa, 594 A.2d 882 (RI. 1991). See also, Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382,65 L.Ed.2d 392 (1980); Keeble v. United States, 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973); State v. Hockenhull, 525 A.2d 926, 930 (RI. 1987); State v. Brown, 549 A.2d 1373, 1377 (RI. 1988). The evidence will support a possible conviction "if the element that distinguishes the [greater charge from the lesser charge] is adequately disputed." State v. Messa, supra; State v. Brown, supra; State v. Muir 432 A.2d 1173 (RI. 1981). Therefore, this Court must examine the trial record to determine whether sufficient evidence existed to warrant a jury charge on a lesser-included offense. State v. Brown, supra, at 1378.

In State v. Messa, supra, for example, the defendant was charged with second-degree sexual assault, defined in relative part as "sexual contact" with another person — namely, an intentional touching of intimate parts for the purpose of sexual arousal, gratification or assault. Although both parties conceded at trial that there had been physical contact, the defendant insisted that it was wholly innocent and not intended for sexual gratification. The trial judge, however, refused to instruct on the lesser-included offense of battery and this Court held that failure constituted reversible error. See also, State v. Hockenhull, supra (because evidence of drug intoxication would negate specific intent element of first- and second-degree murder, trial judge erred in failing to instruct on manslaughter as lesser-included offense).

The quantum of proof required to entitle a defendant to a lesser-included instruction is extremely low. In fact, a defendant only need show "any evidence however weak" to establish an adequate dispute between the elements. Belton v. United States, 382 F.2d 150, 155 (D.C.Cir.

1967). See also, Price v. State, 570 A.2d 887, 889 (Md.App. 1990) (as long as "some evidence" is present, trial judge should instruct jury on all lesser included offenses of murder); Rease v. United States, 403 A.2d 322 (D.C.App. 1979); Birdsong v. State, 231 S.E.2d 813 (Ga.App. 1976)[7]

The underlying view supporting this low evidentiary threshold is that a trial judge should instruct on a lesser-included offense unless a conviction on that offense would be irrational based upon the evidence presented at trial. State v. Hockenhull, supra (evidence, "however minimal," must permit reasonable jury to find defendant incapable of forming specific intent upon which malice could be predicated). See also, United States v. Comer, 421 F.2d 1149, 1154 (D.C.Cir. 1970); Driscoll v. United States, 356 F.2d 324, 327 (5th Cir. 1966). A trial court "must appraise all the testimony and evidence to determine whether it is capable of more than one reasonable inference." United States v. Comer, supra, at 1154.

Rhode Island case law provides that the critical difference between first and second-degree murder is the duration of premeditation.

> It is now well established in this jurisdiction that for a homicide to be classified as murder there must be shown to have existed premeditation on the part of the accused. We have remarked in earlier cases that the key element in differentiating between first and second-degree murder depends on the extent or amount of premeditation exhibited by the defendant's actions.

State v. Page, 104 RI. 323, 334, 244 A.2d 258, 264 (1968)(emphasis supplied). Accord, State v. Brown, 744 A.2d 831, 838-39 (RI. 2000); State v. Campbell, 691 A.2d 564, 572 (RI. 1997) ;State v. Arnazeen, 526 A.2d 1268, 1271 (RI. 1987); State v. Fenik, 45 RI. 309, 315, 121 A. 218,

[7] In a related context, this Court has held that a trial judge must instruct a jury on defendant's theory, even though that defense might be completely unbelievable, and based on "slight and tenuous" evidence. State v. Butler, 107 RI. 489, 495-496, 268 A.2d 433, 436 (1970). In ***Butler,*** the Court faulted the trial judge for failing to instruct the jury on self-defense, although the defendant herself did not believe that her defensive actions caused the fatal injury, and the medical examiner's testimony flatly contradicted a theory of self defense.

221 (1923). In State v. Crough, 89 RI. 338, 152 A.2d 644 (RI.1959), the Court stated that "the difference [between first and second degree murder is merely the length of time that the premeditation existed before the killing." Id. At 52, citing State v. Fenik, supra. To support a first-degree murder conviction an accused must have formed a premeditated intent to kill for more than a moment before the actual killing. State v. Grabowski, 644 A.2d 1282, 1285 (RI. 1994); State v. Amazeen, supra.; State v. Myers, 115 RI. 583, 591, 350 A.2d 611, 615 (1976); State v Fenik, supra. However, if the defendant premeditated merely momentarily, the offense is second degree murder. State v. Grabowski, supra. at 1285.

In the instant case, the state's evidence, if believed, showed that three days after Hugo Andino brandished a knife at Francisco Sosa, causing Mr. Sosa to flee, Mr. Sosa was heard to say that he was going to "get" Mr. Andino. A few minutes after that, the state's witnesses said, Mr. Sosa was seen approaching with a gun. The timing of his appearance is sometime after Ms. Vega's return and not clear. From the sidewalk, the witnesses said, Mr. Sosa fired a single shot in the direction of Mr. Andino and Erica Cambero, which shot struck and fatally wounded Mr. Andino. This evidence certainly supports a rational finding that Mr. Sosa planned to "get" Mr. Andino back by terrifying him with a deadly weapon, just as Andino had terrified Mr. Sosa with a weapon a few days before. Mr. Sosa up to this point having otherwise shown law abiding restraint in the face of an assault on his own life should somehow now have been plotting to at that very moment shoot at Mr. Andino is completely unsupported by the evidence. Much to the contrary and far more conceivable was the theory of further provocation, Ms. Vega's loud comments up to the window that caused a heat of the moment response, a momentary response, consistent with Mr. Sosa's statement to police that he is on a daily basis confronted by his neighbors and that he was in fear of his life.

Thus, this case is quite distinguishable from State v. Brown, supra, 744 A.2d 831. where the defendant argued that the trial justice erred in denying his request for instructions on murder in the second degree and instead instructing only on the elements of first degree murder. This Court, in Brown, approved of the trial justice's refusal to permit the jury the option of returning a second degree murder verdict, noting that the victim had been "subjected to a sustained attack prior to her death," Id. at 839. Injuries were inflicted to the victim's entire body, during which time she apparently fought back and incurred defense wounds to her arms. Other wounds which this Court detailed, "suggest[ed] a prolonged period during which this attack continued." Id., at 839. Thus, this Court concluded that the victim:

> was viciously murdered in a manner that demonstrated more than momentary resolve. We are satisfied that the state produced ample evidence to support a conviction for first-degree murder. Accordingly, because there was no evidence to support an instruction on second-degree murder, we are satisfied that such an instruction was not warranted. We conclude that the trial justice did not err in refusing to charge the jury on the elements of second degree murder.

Id, at 839.

Here, by contrast, there was no sustained attack that demonstrated more than momentary resolve. Instead, the fatal assault took just the instant required to pull the trigger. Significantly, this jury, after several hours of deliberation, sent the trial justice a request for reinstruction and for options other than first degree murder; thus, they obviously were encountering difficulty finding, beyond a reasonable doubt, that the evidence satisfied the elements of first degree murder on which they had been instructed. This case is thus more analogous to State v. Guzman, 752 A.2d 1 (RI. 2000)(appeal from conviction) and State v. Guzman 794 A2d. 474 (R.I. 2002)(appeal from denial of sentence reduction motion), where, although the appellant armed himself with a firearm well in advance of the shooting, "the jury found that the premeditation

was not of sufficient duration to establish first-degree murder" and, therefore, returned a verdict of guilty of murder in the second degree.

Whether or not Mr. Sosa had resolved to kill Mr. Andino when he procured the gun and approached through the yard, or whether he resolved to kill him only in the less than momentary instant when he fired the weapon, was a question required by law to be submitted to the jury. Accordingly, Mr. Sosa respectfully submits that the trial justice committed reversible error when he instructed, over defense objection, only on the issue of murder in the first degree.

## III. DENIAL OF THE MOTION TO DISMISS THE JURY PANEL FOR SYSTEMIC EXCLUSION OF MINORITIES WAS ERROR AND DENIED THE DEFENDANT A FAIR TRIAL

The trial justice erred in not passing the case or, in the alternative, in not bringing in a new jury panel or in not holding a hearing once defendant raised the issue that no minorities were present on the jury panel from which his jury was to be drawn. No greater damage could be done to the defendant's opportunity to have a fair trial. The jury ought to have been drawn so as to include people from the cultures and backgrounds of the community so that as they sit in judgment they can have a frame of reference within which to evaluate the witnesses they are hearing from. Prior to the start of trial, during the jury selection process, a panel of approximately forty prospective jurors was called, of whom only two were apparently of minority ethnicity (Tr. II-6). After one of those two minority jurors was excused for cause,[8] defense counsel moved to dismiss the panel, for a violation of the Sixth Amendment fair cross-section requirement. In his motion, counsel noted that to prevail, he was required to prove three

[8]The potential juror was acquainted with Mr. Sosa's mother, had spoken to her about the case, and candidly admitted that she had formed an opinion about the matter (Tr. II, 5-6).

predicates: (1) that the group alleged to be excluded is a distinctive group of the community and he alleged that individuals of African-American and Latin American descent did represent a distinct group; (2) that the representation of this group from the venires from which juries are selected is not fair and reasonable in relation to their number in the community; and (3) that the under-representation is due to systematic exclusion of the group by the jury selection process (Tr. II-6-9). The trial justice summarily denied the motion as untimely, ruling that it should have been targeted at the entire venire, not at this later stage where a particular panel had been culled from that larger body (Tr. II- 9). After the return of the verdict, at the hearing on the motion for a new trial, the defense again renewed its objection on the basis of a denial of the fair cross-section requirement (Tr. III- 469).

The Sixth Amendment's right to trial by jury, made binding upon the states by the Fourteenth Amendment, Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), contemplates a jury drawn from a fair cross-section of the community.

In Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) the U States Supreme Court there said:

> [w]e accept the fair-cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment and are convinced that the requirement has solid foundation. The purpose of a jury is to guard against the exercise of arbitrary power - to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge. Duncan v. Louisiana, 391 U.S., at 155-56. This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial. "Jury by trial presupposes a

> jury drawn from a pool broadly representative of the community as well as impartial in a specific case. . . [TheJ broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civil responsibility. Thiel v. Southern Pacific Co., 328 U.S. 217, 227 (1946)(Frankfurter, J., dissenting).

Taylor v. Louisiana, Id., 419 U.S. at 530to-31.

A jury properly drawn would be able to rely on its common sense drawn from its life in the community, not unlike the defendants and thus be able to say I believe this person or I do not believe her story. Here that did not happen. The presence on that jury of African American and Hispanic members was vital to a fair outcome. Rather no fair inquiry was undertaken to determine if the panel was constitutionally defective as being the product of a system which systematically by failing to reach such citizens and deliberately by supplying only limited numbers, excludes minority members. [9] The footnoted material show in a rudimentary way that

[9] U.S. Census Bureau, 2000 Census of Population, Public Law 94-171 Redistricting Data File. Updated every 10 years. http://factfinder.census.gov. see also:

U.S. Census Bureau

**State and County *QuickFacts*** QuickFacts Main | FAQs | What's New

| People QuickFacts | Rhode Island | USA |
|---|---|---|
| Population, 2001 estimate | 1,058,920 | 284,796,887 |
| Population percent change, April 1, 2000-July 1, 2001 | 1.0% | 1.2% |
| Population, 2000 | 1,048,319 | 281,421,906 |
| Population, percent change, 1990 to 2000 | 4.5% | 13.1% |
| Persons under 5 years old, percent, 2000 | 6.1% | 6.8% |
| Persons under 18 years old, percent, 2000 | 23.6% | 25.7% |
| Persons 65 years old and over, percent, 2000 | 14.5% | 12.4% |
| Female persons, percent, 2000 | 52.0% | 50.9% |
| | | |
| White persons, percent, 2000 (a) | 85.0% | 75.1% |
| Black or African American persons, percent, 2000 (a) | 4.5% | 12.3% |
| American Indian and Alaska Native persons, percent, 2000 (a) | 0.5% | 0.9% |
| Asian persons, percent, 2000 (a) | 2.3% | 3.6% |
| Native Hawaiian and Other Pacific Islander, percent, 2000 (a) | 0.1% | 0.1% |
| Persons reporting some other race, percent, 2000 (a) | 5.0% | 5.5% |
| Persons reporting two or more races, percent, 2000 | 2.7% | 2.4% |

at least 18.1% of the pool, were it truly representative ought to have been made up of minority members. Out of the forty person pool at least seven ought to have been drawn from minority members of the community. That didn't happen.

In State v. Gaines, 528 A.2d 305 (R.I. 1987), the issue of what constitutes a fair jury was considered. "Thus, on appeal we are faced only with a situation in which no black persons were in this particular jury panel from which this defendant's jury was chosen. As we said in State v. Clark, 112 R.I. 270, 275, 308 A.2d 792, 795 (1973), "an accused has no right to demand that members of his race be on the jury which tries him. He does, however, have a right to require that a state not engage in practices which result in the systematic and deliberate exclusion of his race from the jury lists." However, where as here defendant makes neither an allegation nor a showing that the jury-selection process under G.L. 1956 (1969 Reenactment) chapter 9 of title 9, has resulted in the systematic and deliberate exclusion of members of a particular race, see Clark, 112 R.I. at 275, 308 A.2d at 795; see also State v. Johnson, 116 R.I. 449, 457, 358 A.2d 370, 375 (1976) ("[A] defendant who complains about an absence from the jury of representatives from an identifiable segment of the community must prove that their absence is due to a preconceived plan conceived by those who are responsible for the formulation of the jury lists")." In the Gaines case, the defendant had "not met his burden of proof; thus, the denial of his motions was not error. The Court's holding in Batson does not mandate a change in that analysis with respect to a "challenge" either to the jury-panel-selection process or to the composition of a particular jury panel.

The U.S. Supreme Court stated that a fair cross section of the community as required of juries, is contemplated by the Sixth Amendment. Taylor v. Louisiana, 419 U.S. 522 (1975). This is the exact case law that Sosa argued in the trial court. Prior to the start of the trial, counsel argued "What is facing us in the courtroom at this point in time – you've just excused the one

---

| | | |
|---|---|---|
| Persons of Hispanic or Latino origin, percent, 2000 (b) | 8.7% | 12.5% |
| White persons, not of Hispanic/Latino origin, percent, 2000 | 81.9% | 69.1% |

person who appears to be a person of color in the sense of being African American extraction. I fear, given what is left, that this is not, at this point, a valid representation of the community and as such is causing – might cause Mr. Sosa to be deprived of his right to a fair representative jury as contemplated by the Sixth Amendment." (Tr.II- 8).

Here, it was not until defense counsel saw the non-representative panel that he concluded that the entire venire must have been unconstitutionally comprised. At that point - the earliest point when he was aware of the racial composition of the potential jurors arrayed before him - he moved to dismiss the panel. Counsel specifically recognized and acknowledged that to prevail, he bore the burden of adducing proof that the under-representation of minorities was due to their systemic exclusion. Thus, the trial justice erred in summarily denying the motion to dismiss, without affording the defense an opportunity to marshal and present its evidence. Because this error goes to the very foundation of the right to trial by jury, it undermines the integrity of the convictions and requires that a new trial be granted.

## IV. TRIAL COURT'S DENIAL OF THE MOTION FOR A NEW TRIAL WAS AGAINST THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

The trial justice erred in denying Sosa's motion for a new trial because the verdict was against the weight and sufficiency of the evidence. The evidence presented by the prosecution was not legally sufficient to establish defendant's guilt beyond a reasonable doubt. Mr. Sosa requests that this Court order a new trial or, in the alternative, remand the case with directions that the Superior Court enter a judgment of acquittal.

This court, in State v. Otero, 788 A.2d 469. (R.I. 2002), stated that, "The standard to be applied in evaluating a motion for a new trial is well established. "In deciding a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." quoting State v. Banach, 648 A.2d 1363, 1367 (R.I. 1994) (citing State v. Marini, 638 A.2d 507, 515 (R.I. 1994)).

The Otero Court further stated, "If, after conducting this independent review, the trial

justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." Otero, 788 A.2d at xx, Marini, 638 A.2d at 515-16. If, however, "the trial justice finds that the state has failed to sustain its burden of proof, a new trial must be ordered." State v. Clark, 603 A.2d 1094, 1096 (R.I. 1992).

In enunciating the court's ruling on a new-trial motion, "the trial justice need not refer to all the evidence supporting the decision but need only cite evidence sufficient to allow this court to discern whether the justice has applied the appropriate standards." Banach, 648 A.2d at 1367. If "the trial justice complied with the requisite procedure and articulated an adequate rationale for denying a motion for a new trial, that decision will be given great weight and will not be disturbed unless the trial justice 'overlooked or misconceived material evidence relating to a critical issue or if the justice was otherwise clearly wrong.'" State v. Bleau, 668 A.2d 642, 646 (R.I. 1995) (quoting Banach, 648 A.2d at 1367).

Clearly the only evidence against Mr. Sosa was the so called eye witnesses. These witnesses each were shown to have a bias against the defendant. Mr. Sosa described his problems with the people next door as **constant** and further **that he feared to return home**. He twice solicited police assistance as a result of the knife attack. First in his encounter with the patrol car and second with following the advise of the patrolman and going to Central Station to make a report. All three of these witnesses were there that day. The state chose not to produce Wanda Cruz, who's credibility given her reported aggression and drinking would have been highly suspect. The state also did not produce the remaining eye witness to the gun disposal, relying instead on his transcribed testimony. Its efforts to produce this witness, paltry at best should inspire little confidence in the trial's outcome. If this jury had seen the witness, assess his credibility, compared it to the others a wholly different event may well have occurred.

Clearly if these biased witnesses are to be believed, then at best it appears that an idle statement made through an open window, was fanned into a flame by Bethsiada Vega's encounter in the alleyway. For there can be no doubt, that it was not until she began speaking loudly to Francisco Sosa's wife on the continuing disputes between the people in the two houses

that the situation reportedly erupted. Prior to then judged from the actions of all involved no one was planning for or protecting themselves from an imminent attack let alone a lethal one.

If the testimony is not to be believed and there is every reason not to believe it then a new trial should have been granted at the very least. The testimony of LeTesha Tate that she knew nothing of the Andino knife attack until learning of it in court was simply not credible. The notion that Andino who hunted Sosa along with his friends were not tormenting the defendant to the last day flies in the face of the facts. Mr. Sosa after being chased by an assailant reports the matter to the police. He takes no other action accept what the jury was asked to believe that out of no where he appears days later and presents himself to render a threat against Andino. A threat he takes no action on. No its not until Vega is loudly talking to the Mr. Sosa's wife up in the apartment window that the jury is told that Sosa spurs to action. It is crystal clear that at least one reasoned review of the evidence would lead the trier of fact to conclude that Vega presented new and fresh provocation to which Sosa the jury is told immediately responded in that very moment. The facts of the case reasonably could support that conclusion. Another fair conclusion, clearly drawn by members of the first jury was that the witnesses account was not credible. The evidence shows that for whatever reason they hated Mr. Sosa with a distinct passion calling out for his death in encouraging the Andino knife attack. Their extreme bias against Sosa was palpable from the pages of the transcript. The testimony given supports that view clearly by its vagueness and self serving nature. Is it any more difficult for them in their hatred to have wrongly accused him. For the trial court to have credited their versions out right and ignore the glaring and tell tale inconsistencies reveals clear error and is contrary to the weight and sufficiency of the evidence. Here the trial justice abdicated his role as the thirteenth juror and simply allowed the verdict to stand without critical scrutiny. The cause of justice required more. A new trial ought to have been granted.

## CONCLUSION

Because the jury was constitutionally deficient, heard testimony that should have been excluded, were improperly instructed on charges and because the trial justice abused his discretion and was clearly wrong in denying the motion for a new trial, or for any other reason which may appear on oral hearing of this cause, Mr. Sosa prays that this Honorable Court sustain this appeal, reverse his convictions, and remand this matter for a new trial in the Superior Court.

Respectfully Submitted,

FRANCISCO SOSA

By His Attorney

George J. West, Reg # 3052

## CERTIFICATE OF SERVICE

I hereby certify that on this day of Sept 2. 2003, I delivered a true copy of the within Brief of the Defendant-Appellant to the Department of the Attorney General, by causing the same to be hand delivered to 150 South Main Street, Providence, Rhode Island 02903.

Case 1:05-cv-00123-ML Document 3 Filed 04/13/2005 Page 60 of 65



claim, indicating its acceptance or rejection thereof." Finding the language of section 12 "utterly unambiguous," the arbitrator ruled that the city's "failure to [file a written response] within the fifteen days provided by the parties' collective bargaining agreement" barred the city from further challenging the job-relatedness of Sgt. Renaud's claim. Accordingly, she held that Renaud must be granted IOD status effective July 21, 2000. The Superior Court agreed; the hearing justice denied the city's motion to vacate the award and awarded attorney fees to Renaud as well as the union. Judgment was entered in favor of the union, confirming the arbitration award. This appeal followed.

[1, 2] We often have noted that judicial authority to review an arbitration award is statutorily prescribed and very limited. *Town of North Providence v. Local 2334 International Association of Fire Fighters, AFL–CIO,* 763 A.2d 604, 605 (R.I. 2000) (per curiam); *see Jacinto v. Egan,* 120 R.I. 907, 912, 391 A.2d 1173, 1175 (1978). The standard of review in this situation is governed by G.L.1956 § 28–9–18(a), which allows a court to vacate an arbitrator's award only in three circumstances:

"(1) When the award was procured by fraud.

"(2) Where the arbitrator or arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award upon the subject matter submitted was not made.

"(3) If there was no valid submission or contract, and the objection has been raised under the conditions set forth in § 28–9–13."

Limited judicial review of these proceedings is anchored in strong public policy favoring private settlement of collective bargaining grievances. *Rhode Island Council 94, AFSCME, AFL–CIO v. State,* 714 A.2d 584, 588 (R.I.1998); *Belanger v. Matteson,* 115 R.I. 332, 356, 346 A.2d 124, 138 (1975). Accordingly, we will not disturb an arbitrator's award "absent a manifest disregard of a contractual provision or a completely irrational result." *Rhode Island Council 94,* 714 A.2d at 587 (quoting *Town of Coventry v. Turco,* 574 A.2d 143, 146 (R.I.1990)); *Matteson,* 115 R.I. at 355–56, 346 A.2d at 137–38. As long as the award "draws its essence" from the contract and is based upon a "passably plausible" interpretation of the contract, it will be upheld. *Jacinto,* 120 R.I. at 912, 391 A.2d at 1176.

[3] The city contends that the hearing justice erred in confirming the award because the award conflicts with state law, is not a passably plausible interpretation of the collective bargaining agreement, and is irrational. None of these arguments are persuasive. As we noted above, there was only one issue before the arbitrator: did the city's treatment of Renaud violate the CBA? That is, was the city's response to Renaud's injured-on-duty report consistent with the provisions of the CBA? In making her determination, the arbitrator looked at the plain and unambiguous language of the contract. *See Town of North Providence,* 763 A.2d at 606. That language required the city to respond in writing within fifteen days of receiving an IOD claim or the claim would be considered accepted. Whether one considers Renaud's claim as originating in January or August 1997, it does not appear that the city conclusively accepted or rejected it in writing within fifteen days of those dates. The arbitrator concluded that the city's failure to respond precluded it from contesting whether Renaud suffered an on-duty injury. We are satisfied that this was a plausible interpretation of the relevant contractual provisions and did not lead to an irrational result. Accordingly, we will not disturb the judgment.



[4] The city also appeals from the award of attorney fees to Renaud's private attorney. Section 28–9–18(c) provides that if the party to an arbitration decision moves to vacate the award, and that motion is denied, "the moving party shall pay the costs and reasonable attorneys' fees of the prevailing party." Renaud has been represented by his own personal attorney throughout all stages of this litigation. Accordingly, when the Superior Court confirmed the arbitration award, both the union attorney and Renaud's attorney moved for reimbursement of fees. The Superior Court ruled that the "prevailing party" included not only the union, but also the employee, and awarded attorney's fees to both attorneys.

We are of the opinion that § 28–9–18(c) does not entitle Renaud's personal attorney to an award of attorney fees. The arbitration statute provides that the right to arbitrate labor controversies is grounded in the contract between the employer and the employee's collective bargaining representative. Section 28–9–1 provides in pertinent part: "A provision in a written contract between an employer and an association of employees, [or] a labor union * * * to settle by arbitration any controversy is valid, irrevocable, and enforceable * * *." Although individual employees are beneficiaries to the contract, they are not parties to that contract. We note that there is no suggestion of unfair representation by the union.

In this instance, the city and the union submitted the controversy to arbitration pursuant to § 28–9–1. Although Renaud entered an appearance in the arbitration and again in Superior Court, he never was granted the status of a party. The CBA provided that the union would represent Renaud's interests in this matter and the union did so. Renaud's decision to retain private counsel was his choice, and the city may not be held liable for that decision. Accordingly, Renaud is not a "prevailing party" within the meaning of § 28–9–18(c), and the city is not required to pay his attorney's fees.

The judgment of the Superior Court confirming the arbitrator's award is affirmed in part and vacated in part. That portion of the judgment awarding attorney's fees to Renaud's private counsel is vacated. The papers of the case are remanded to the Superior Court.

KEY NUMBER SYSTEM

**STATE**

**v.**

**Francisco SOSA.**

**No. 2001–184–C.A.**

Supreme Court of Rhode Island.

Dec. 22, 2003.

**Background:** Defendant was convicted, upon retrial following mistrial in the Superior Court, Providence County, Robert D. Krause, J., of first-degree murder and possession of a firearm without a license, and was sentenced to life imprisonment and ten years' imprisonment, respectively. Defendant appealed.

**Holdings:** The Supreme Court, Goldberg, J., held that:

(1) recorded testimony of state's witness in defendant's original trial was admissible in retrial;

(2) trial court did not abuse its discretion in finding that state made good-faith

6

effort to procure witness' attendance at retrial;

(3) evidence did not entitle defendant to instruction on second-degree murder;

(4) trial court did not abuse its discretion in denying defendant's motion to dismiss jury panel; and

(5) defendant's unsupported contentions did not entitle him to new trial.

Affirmed and remanded.

**1. Criminal Law ⚬543(2)**

Recorded testimony of state's witness in murder defendant's original trial was admissible in retrial following mistrial, where defendant had opportunity to develop previous testimony through cross-examination and state made good-faith effort to procure witness' attendance at second trial.

**2. Criminal Law ⚬662.1**

Sixth Amendment to the United State Constitution, made applicable to the states through the Fourteenth Amendment, affords a criminal defendant the right to confront the witnesses against him or her. U.S.C.A. Const.Amends. 6, 14.

**3. Criminal Law ⚬662.1**

State constitution guarantees a defendant the right of confrontation. Const. Art. 1, § 10.

**4. Criminal Law ⚬543(2)**

Trial court did not abuse its discretion in finding, for purposes of prior recorded testimony exception to rule against hearsay, that state made good-faith effort to procure attendance at murder defendant's retrial of witness who had testified in original trial; investigating officer contacted witness' known associates, searched only building in which witness was known to stay, distributed his business card and pager number to people in area who were familiar with witness, checked area hospitals and shelters, searched Bureau of Criminal Identification (BCI) and Adult Correctional Institutions (ACI) records, and inquired with various utilities.

**5. Criminal Law ⚬662.60**

Witness' unavailability, and the use of his or her former testimony at trial, does not violate a defendant's right of confrontation if the proponent of that testimony has made a reasonable and good faith effort to procure that witness' attendance for trial. U.S.C.A. Const.Amend. 6; Const. Art. 1, § 10.

**6. Criminal Law ⚬1153(1)**

Court reviewing a trial court's ruling on the admissibility of prior recorded testimony will not disturb a finding of reasonable diligence and good faith absent an affirmative showing that the trial court abused its discretion.

**7. Criminal Law ⚬543(2)**

Touchstone of unavailability analysis, for purposes of determining the admissibility of a witness' prior recorded testimony, is reasonableness of the efforts to locate the witness, not exhaustion.

**8. Criminal Law ⚬543(2)**

State's efforts to procure witness for retrial in murder prosecution were not unreasonable, for purposes of determining admissibility in retrial of witness' recorded testimony from original trial; failure to notify witness after first trial that subpoena for his testimony remained in effect and that he might be called to testify second time, and commencement of efforts to locate witness for retrial one week before retrial commenced, were not unreasonable given witness' cooperation at time of original trial and lack of any indication that witness would be unavailable at time of retrial.



**9. Homicide ⚬1456**

Evidence in prosecution for first-degree murder did not entitle defendant to instruction on second-degree murder, in absence of any indication that defendant did not act with premeditation; defendant made numerous verbal threats to victim and subsequently reappeared with gun some minutes later, scaling fence with gun in hand to come within firing range of victim, demonstrating more than momentary resolve to commit murder.

**10. Homicide ⚬538**

Defendant on trial for first-degree murder also is simultaneously on trial for all lesser-included offenses, including second-degree murder.

**11. Homicide ⚬542, 547**

Difference between first- and second-degree murder is the element of premeditation; first-degree murder requires proof of premeditation of more than a momentary duration and proof of deliberation, whereas second-degree murder does not.

**12. Homicide ⚬1456**

If the evidence suggests the possibility that a murder defendant's decision to kill was made a mere moment or less before the fatal shot, the trial justice must instruct the jury on both first- and second-degree murder.

**13. Criminal Law ⚬814(20)**

Trial justice should not instruct the jury on a lesser-included offense when that charge is unsupported by the evidence.

**14. Jury ⚬33(1.10)**

Trial court did not abuse its discretion in denying murder defendant's motion to dismiss jury panel, based upon bare allegation that panel did not represent fair cross-section of the community, where defendant failed to demonstrate that group allegedly excluded was distinctive group in community, that its representation in venire was not fair and reasonable in relation to number of such persons in community, or that under-representation was due to systematic exclusion from jury-selection process, but rather waited until minority juror was disqualified and then moved to dismiss particular panel outright, without requesting continuance and hearing to develop and present proof.

**15. Jury ⚬33(1.10)**

Any under-representation of minorities in particular jury panel in murder prosecution did not warrant dismissal of panel; right to jury representing fair cross-section of the community applied to entire venire, not to individual jury panels. U.S.C.A. Const.Amend. 6.

**16. Jury ⚬33(1.1)**

Sixth Amendment is designed to prevent the state from utilizing a system that deliberately excludes groups of potential jurors from the entire jury pool. U.S.C.A. Const.Amend. 6.

**17. Criminal Law ⚬935(1)**

Murder defendant's unsupported contentions that state's witnesses were unworthy of belief and that evidence supported alternative factual hypotheses inconsistent with his guilt did not entitle defendant to new trial, absent any allegation or indication that trial court overlooked material evidence.

**18. Criminal Law ⚬935(1)**

When ruling on a motion for a new trial, the trial justice acts as a thirteenth juror and independently evaluates the credibility of the witnesses and the weight of the evidence.

**19. Criminal Law ⚬1134(4), 1158(1)**

Once a trial justice has evaluated the evidence and articulated his or her reasons for denying the new trial, a reviewing

court will not disturb that decision unless he or she overlooked or misconceived material evidence relating to a critical issue or if the justice was otherwise clearly wrong.

---

Jane M. McSoley, Aaron Weisman, Providence, for Plaintiff.

George J. West, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

GOLDBERG, Justice.

In this appeal, the defendant, Francisco Sosa (defendant or Sosa), asks this Court to set aside his first-degree murder conviction and remand this case for a new trial. Sosa alleges that the trial justice made erroneous evidentiary rulings, mistakenly refused to instruct the jury on the offense of second-degree murder, permitted a constitutionally infirm jury panel, and erroneously denied his motion for a new trial.

### Facts and Travel

On July 20, 1998, Bethzaida Vega (Bethzaida) hosted an afternoon cookout in the backyard of her first-floor apartment at 527 Cranston Street in Providence. Among the guests were Bethzaida's friend Wanda Cruz (Wanda), Bethzaida's neighbor LaTesha Tate (LaTesha), and LaTesha's friends, Erica Cambero (Erica) and Hugo Andino (Hugo). As the cookout drew to an end, Wanda's son, "CJ," came into the house and alleged that Sosa, who lived at 531 Cranston Street, had "smacked" him after he and Sosa's son argued. This prompted an argument between Wanda and Sosa, who denied having hit CJ. Bethzaida testified that Wanda shoved Sosa, who, in turn "smacked her around a couple of times," causing her to fall to the floor. Bethzaida then brought Wanda inside her apartment, away from defendant.

Erica testified that Hugo went into the kitchen and then left the house brandishing a kitchen knife. He chased Sosa down the driveway and off the property, at one point coming within ten to fifteen feet of catching him. Sosa filed a complaint with the Providence Police the next day. In the complaint, Sosa reported that the previous afternoon he had witnessed a ten-year-old boy holding his four-year-old son by the throat. When he went outside, he observed the same boy holding his son by his feet and dangling him over a wall. According to Sosa's police complaint, when he intervened, a Hispanic female approached him and punched him in the mouth, and then a Hispanic male threatened him with a knife and chased him off the property.

Defense witness Ana Puello, another resident of 527 Cranston Street, testified to a slightly different version of events. She said that she witnessed the interaction between Sosa and CJ from her apartment window. According to her, Sosa did not hit the child, and the boy lied when he told his mother that Sosa had "smacked him." The witness testified that three women then accosted Sosa, striking him and yelling "kill him." She said she also saw Hugo chase Sosa with a knife.

LaTesha testified that a few days later, on July 23, 1998, she was in the living room of her first-floor apartment at 527 Cranston Street playing cards and drinking beer with Erica, Hugo, and another man. Both LaTesha and Erica testified that about 6 p.m., Sosa came to LaTesha's apartment door asking for Bethzaida. LaTesha did not open the door, but did



look through the peephole. She testified that Sosa was wearing a dark blue shirt with a Red Sox logo. A few minutes later, Sosa appeared outside LaTesha's living room window and pointed out Hugo to his wife, saying: "That is him, I am going to get him." Sosa also yelled to Hugo directly, saying: "I am going to get you."

When Bethzaida arrived home a short time later, LaTesha reported defendant's threatening remarks. Bethzaida testified that she then went outside to retrieve her two children. While she was standing in the alleyway between the two apartments, she encountered Sosa's wife and warned her that her husband's behavior was endangering the children. At that point, she observed Sosa, gun in hand, climbing the fence that divided the two yards. Bethzaida also noticed that Sosa was wearing a blue shirt with a Red Sox logo. Bethzaida screamed to LaTesha to lock the doors, and ran to her eight-year-old son, who was playing basketball on the other side of the house. As she was bringing her older son inside, she heard a gunshot.

LaTesha and Erica testified that they heard Bethzaida yell a warning that Sosa was approaching with a gun. LaTesha, Erica, and Hugo ran toward the front porch, where Bethzaida's two-year-old son was playing. LaTesha stopped to pick up the phone and dial 911, while Erica and Hugo continued outside onto the porch. Erica testified that she saw Sosa approach Hugo with his hand behind his back, and that as the decedent reached down to pick up the two-year-old, Sosa shot him in the back. Hugo managed to get the child into LaTesha's apartment before collapsing on the floor; he was taken to Rhode Island Hospital, where he died during emergency surgery. Chief Medical Examiner Elizabeth Laposata, M.D., testified that death resulted from massive internal bleeding caused by a bullet that passed into Sosa's back and through his large bowel and mesenteric artery.

Responding police investigators took Bethzaida, LaTesha, and Erica to Providence police headquarters. Each gave a separate statement, and each selected Sosa's photograph as that of the shooter.

Over defense objection, the state was allowed to read the testimony of *Antonio* Gonzalez (Gonzalez) into the record. Gonzalez was a prosecution witness at a previous trial against Sosa for these same crimes. That trial resulted in a hung jury. Gonzalez was declared unavailable at this trial after police efforts to locate him proved unsuccessful. Gonzalez previously had testified that as he was leaving a Cranston Street liquor store on the evening of July 23, 1998, he heard a gunshot. He noticed a man wearing a red and blue shirt with a gun in his hand. The man ran into the parking lot of Gonzalez Taxi, where Gonzalez worked. Gonzalez Taxi is across the street from the Cranston Street liquor store. Gonzalez testified that although he did not see the man discard the weapon, he saw him leave the lot without the gun. Gonzalez then went toward the back corner of the lot and discovered a firearm under a red rug. That revolver, along with a .38-caliber projectile recovered from Hugo's body, were examined by Robert Hathaway of the University of Rhode Island Crime Laboratory, who determined that the fatal bullet was fired from that particular weapon.

As noted, Sosa's first trial, in June 2000, resulted in a mistrial because the jury was unable to reach a unanimous verdict. Sosa was retried before a second jury in October 2000 and was found guilty of first-degree murder and possession of a firearm without a license. His motion for a new trial was denied on November 10, 2000, and on January 16, 2001, the trial justice imposed a mandatory life sentence for the

first-degree murder conviction and a ten-year sentence on the illegal-weapon charge. This appeal followed.

I

### Gonzalez's Prior Testimony

[1] The defendant assigns error to the trial justice's decision to declare Gonzalez unavailable and to admit his previous testimony during the state's case-in-chief. The defendant contends that the introduction of former testimony infringed his constitutional right to confront and cross-examine the witnesses against him.

[2, 3] The Sixth Amendment to the United State Constitution, made applicable to the states through the Fourteenth Amendment, affords a criminal defendant the right to confront the witnesses against him or her. *State v. Scholl*, 661 A.2d 55, 58 (R.I.1995) (citing *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)). Article 1, section 10, of the Rhode Island Constitution also guarantees a defendant the right of confrontation. *Scholl*, 661 A.2d at 58–59. The United States Supreme Court has emphasized that the Confrontation Clause reflects a preference for face-to-face confrontation at trial, and that "a primary interest secured by [the provision] is the right of cross-examination." *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (quoting *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)).

The right to face-to-face confrontation is not absolute, however; "[t]he strict requirement of confrontation in the Sixth Amendment * * * is tempered by the dictates of practicality and judicial economy." *Scholl*, 661 A.2d at 59 (quoting *State v. Burke*, 574 A.2d 1217, 1222 (R.I.1990)). Rule 804(b)(1) of the Rhode Island Rules of Evidence provides that former recorded testimony of a witness is not excluded by the rule against hearsay if: (1) the declarant is unavailable to testify, and (2) the party against whom the testimony is now offered had the opportunity to develop that testimony on cross-examination. A witness is considered "unavailable" when he or she is "absent from the hearing and the proponent of his or her statement has been unable to procure the declarant's attendance by process or other reasonable means." Rule 804(a)(5).

[4] In the case before us, there is no doubt that Sosa had the opportunity to develop Gonzalez's previous testimony through cross-examination. The record reveals that Sosa's attorney thoroughly cross-examined Gonzalez at the first trial in June 2000. Thus, the only question remaining is whether the trial justice abused his discretion when he determined that the state had made a good-faith effort to procure the witness's attendance at the second trial. We are of the opinion that he did not.

[5, 6] A witness's unavailability and the use of his or her former testimony at trial does not violate the defendant's right of confrontation if the proponent of that testimony has made a "reasonable" and "good faith" effort to procure that witness's attendance for trial. *Roberts*, 448 U.S. at 74, 100 S.Ct. 2531; *State v. Brown*, 744 A.2d 831, 835 (R.I.2000). "Whether the state has exercised reasonable diligence in securing the presence of a witness is assessed on a case-by-case basis." *Brown*, 744 A.2d at 835; *State v. Prout*, 115 R.I. 451, 455, 347 A.2d 404, 406 (1975); *State v. Ouimette*, 110 R.I. 747, 755, 298 A.2d 124, 130 (1972). This Court will not disturb a finding of reasonable diligence and good faith absent an affirmative showing that the trial justice abused his or her discretion. *Brown*, 744 A.2d at 835 (citing *Prout*, 115 R.I. at 456, 347 A.2d at 406).



In establishing the witness's unavailability, the state presented Detective Kerrion O'Mara (Det. O'Mara), who recounted the efforts he made to locate Gonzalez before the second trial. He said that he went to Gonzalez Taxi, where Gonzalez occasionally worked. Neighbors and cab drivers told Det. O'Mara that Gonzalez, although occasionally seen on the streets, was homeless. Nonetheless, they directed him to an abandoned house that he was known to frequent. Detective O'Mara visited that house, which was vacant and boarded up, but was unable to find Gonzalez. Detective O'Mara testified that he called area hospitals and checked the Bureau of Criminal Identification (BCI) and Adult Correctional Institutions (ACI) records to see whether Gonzalez had been arrested or incarcerated at any point between the first and second trial. When these avenues proved fruitless, he attempted to find an address for Gonzalez by checking with gas and electric utilities, post offices, and homeless shelters. Additionally, Det. O'Mara visited Cranston Street and Gonzalez Taxi on two other occasions, distributing his business card and pager number and asking people familiar with Gonzalez to contact him if they saw Gonzalez in the neighborhood or on the street.

The trial justice, citing this Court's decision in *Brown*, found that the state had exhibited "reasonable, diligent efforts * * * to corral [Gonzalez]." Accordingly, the trial justice declared Gonzalez unavailable and ordered that his previous testimony be read into the record. The defendant takes issue with this ruling, contending that the state's efforts to find Gonzalez fell short of the standard established in *Brown*. The defendant points to discrepancies between the efforts undertaken to locate an unavailable witness in *Brown* and the investigative search by Det. O'Mara. Specifically, defendant notes that the officer responsible for searching for the witness in *Brown* enlisted the help of other police officers, while Det. O'Mara did not. Furthermore, defendant argues that Det. O'Mara's single visit to the abandoned house where Gonzalez was known to stay was insufficient.

[7] We are not persuaded by Sosa's contentions. Detective O'Mara pursued the same avenues of inquiry that led him to locate Gonzalez for the first trial. These efforts included contacting known associates of Gonzalez who worked for Gonzalez Taxi. Detective O'Mara also searched the only building where Gonzalez was known to stay. Although Det. O'Mara did not enlist the help of other police officers in his search, he did distribute his business card and pager number to people in the Cranston Street area who were familiar with Gonzalez, thereby enlisting the help of those people most likely to encounter him. He also investigated other means of locating Gonzalez, including checking area hospitals and shelters, searching the ACI and BCI records, and inquiring with various utilities. Although additional steps could have been taken, including informing other police officers or searching the vacant building on more than one occasion, the touchstone of our unavailability analysis is reasonableness, not exhaustion. *See Brown*, 744 A.2d at 837 (upholding the reasonableness of the state's search despite the fact that "[i]n hindsight, there may have been additional steps the prosecution could have undertaken in an effort to locate [the witnesses]"). We are of the opinion that Det. O'Mara's search was reasonable and conducted in good faith.

[8] Besides alleging a failure to exercise reasonable diligence to find Gonzalez, defendant also contends that because the police failed to prevent Gonzalez's absence initially after the first trial, he may not be declared unavailable. The defendant cor-

rectly notes that the duty to undertake reasonable efforts to procure a witness's attendance at trial includes the concomitant duty to make reasonable efforts to prevent that unavailability in the first place. *United States v. Mann*, 590 F.2d 361, 368 (1st. Cir.1978). As proof that the state failed to prevent his unavailability in the first instance, defendant points to the fact that Gonzalez was not notified after the first trial that the subpoena for his testimony remained in effect and that he might be called to testify a second time. Furthermore, even after a mistrial was declared, the police made no effort to contact Gonzalez in the ensuing four months, instead waiting until one week before trial to begin their search. Sosa contends that this "inaction" on the part of the police rendered the state's efforts to procure the witness unreasonable.

In *Mann*, the key prosecution witness, Joan Shine (Shine), was a seventeen-year-old Australian native who had been arrested on federal drug charges with the defendant when the two flew into Puerto Rico. After the indictment against Shine was dismissed, the witness was deposed before prosecutors allowed her to return to Australia. When asked during the deposition whether she would return to the United States to testify at the defendant's trial, she gave an equivocal response. Notwithstanding, prosecutors returned her passport and plane tickets, fully aware that she intended to leave immediately for Australia. When the defendant proceeded to trial, Shine refused to return and testify, despite the American embassy's offer to pay her travel expenses. The court declared the witness unavailable and ruled that Shine's deposition could be read into evidence. The First Circuit Court of Appeals reversed, holding that the government had failed to show that it had made a good-faith effort to obtain the witness's presence. *Mann*, 590 F.2d at 367. The First Circuit reasoned that "[i]mplicit * * * in the duty to use reasonable means to procure the presence of an absent witness is the duty to use reasonable means to prevent a present witness from becoming absent." *Id.* at 368. That is not the case before us.

We are not persuaded that the state failed to prevent Gonzalez's absence or that its subsequent efforts to locate him the week before the second trial were unreasonable. Unlike *Mann*, there was no indication that Gonzalez would be unavailable for trial. Although the witness did not have a steady address, he was known to live and work in the Cranston Street area of Providence. Importantly, he appeared and testified at the first trial, giving the state no reason to believe he wouldn't do so again, if necessary. *Brown*, 744 A.2d at 837 ("[The witness] had been a cooperative witness for the state, and therefore we do not fault the state for not taking steps to prevent his disappearance prior to trial."). Although notifying all witnesses that they may be called back to testify is the better practice, we never have suggested that it is a prerequisite to a finding of unavailability. Furthermore, defendant has not demonstrated that informing Gonzalez that the subpoena remained in effect would have produced a different result—given his homelessness, the police would still have had to undertake a search for his whereabouts.

## II

### Second-Degree Murder Instruction

**[9]** Sosa next argues that the trial justice committed reversible error when he refused to instruct the jury on second-degree murder. The trial justice noted that the fact that Sosa was in an altercation at the cookout three days earlier and had been chased away by the decedent, who threatened him with a knife, militated against an instruction on second-degree murder. Further, there was eyewitness testimony that on the day of the murder, defendant appeared at Wanda's window and twice threatened Hugo, only to reappear some minutes later armed with a firearm, apparently intent on carrying out that threat. Accordingly, the trial justice ruled that "the evidence in that light bespeaks only of first-degree murder; a threat, and then the defendant arms himself, stalks, seeks out and then shoots his intended and indeed, announced victim."

**[10–13]** It is well established that a defendant on trial for first-degree murder also is simultaneously on trial for all lesser-included offenses, including second-degree murder. *Brown*, 744 A.2d at 838 (citing *State v. Grabowski*, 644 A.2d 1282, 1286 (R.I.1994)). The difference between first- and second-degree murder is the element of premeditation: first-degree murder "requires proof of premeditation of more than a momentary duration and proof of deliberation whereas second-degree murder does not." *Grabowski*, 644 A.2d at 1285. Accordingly, if the evidence suggests the possibility that the defendant's decision to kill was made a mere moment or less before the fatal shot, the trial justice must instruct the jury on both first- and second-degree murder. *Id.* Conversely, a trial justice should not instruct the jury on a lesser-included offense when that charge is unsupported by the evidence. *Brown*, 744 A.2d at 838 (citing *State v. Figueras*, 644 A.2d 291, 294 (R.I. 1994)).

We are of the opinion that the trial justice did not err in refusing to give a second-degree murder instruction. "In order to have been entitled to a jury charge on second-degree, there must have been minimal evidence produced tending to show that defendant did not act with premeditation." *Figueras*, 644 A.2d at 294. The evidence in this case was otherwise. Although the means of death was a single gunshot, Sosa's numerous verbal threats to the victim and subsequent reappearance with a gun some minutes later indicated that the decision to kill Hugo was not instantaneous. *See id.* (holding that second-degree murder instruction was not warranted because the defendant had threatened to harm the victim days before the murder). The act of scaling the fence with gun in hand demonstrated sustained determination to come within firing range of the decedent, further supporting the conclusion that Sosa exhibited "more than momentary [resolve]" to commit the murder. *Brown*, 744 A.2d at 838–39. Accordingly, we are satisfied that the trial justice did not err in declining to instruct the jury on second-degree murder.

## III

### Jury Selection

The defendant's third assignment concerns the constitutional adequacy of the jury panel from which defendant's jury was selected. The panel consisted of approximately forty potential jurors, of which two apparently were of minority ethnicity. Just before the trial started, one of the potential minority jurors came forward and admitted to the court that she knew defendant and his mother and had discussed the case with her. When the trial justice asked the potential juror whether she had formed an opinion of the case, the juror responded, "Of course, your Honor. I won't lie about that. Of course." The trial justice excused her.

After the potential juror was disqualified, defense counsel pronounced himself "troubled by the fact that, with the exception of the juror who was just excused, there appears to be perhaps one member

of a discernable minority community [remaining]." Counsel suggested that members of the African–American and Latino communities were being excluded systematically from the jury selection process, and moved to dismiss the panel on grounds that it did not represent a fair cross-section of the community. The trial justice denied Sosa's motion as untimely, ruling that it should have been directed at the entire venire and not delayed until this particular panel was selected from a larger juror pool.

The United States Supreme Court has held that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). To demonstrate a *prima facie* violation of the fair-cross-section requirement, the defendant must establish: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *see also State v. Johnson,* 116 R.I. 449, 457, 358 A.2d 370, 375 (1976) (holding that "a defendant who complains about an absence from the jury of representatives from an identifiable segment of the community must prove that their absence is due to a preconceived plan conceived by those who are responsible for the formulation of the jury lists").

[14] In our opinion, the trial justice did not abuse his discretion in denying defendant's motion to dismiss the panel. Although defense counsel articulated the appropriate showing necessitated by *Taylor* and *Duren* to challenge the jury selection process, he failed to demonstrate any of the three factors set forth in those cases. Instead, defendant waited until a minority juror was disqualified and then moved to dismiss the particular panel outright. Given defendant's inability to provide any proof whatsoever to support his contentions, the trial justice correctly rejected the motion to dismiss the panel. *See State v. Gaines,* 528 A.2d 305, 308–09 (R.I.1987) (in which the "defendant makes neither an allegation nor a showing that the jury selection process * * * has resulted in the systematic and deliberate exclusion of members of a particular race, * * * defendant has clearly not met his burden of proof; thus the denial of his motion was not error"). If defendant was not ready to proceed with the requisite proof at the time of his motion, the appropriate step would have been to request a continuance and hearing so he could develop his allegations in an appropriate proceeding. Defense counsel did not request a hearing, leaving the trial justice no choice but to deny the motion to disqualify the particular jury panel. *Johnson,* 116 R.I. at 457, 358 A.2d at 375.

[15, 16] Moreover, even if defense counsel had established that the jury selection process was constitutionally flawed, dismissing the particular jury *panel* would scarcely have remedied the problem. The Sixth Amendment is designed to prevent the state from utilizing a *system* that deliberately excludes groups of potential jurors from the entire jury pool. *State v. Clark,* 112 R.I. 270, 275, 308 A.2d 792, 795 (1973). As the trial justice pointed out, defense counsel had merely "look[ed] around the room and s[aw] thirty people [he was] not happy with," and, instead of properly targeting his motion to the *entire venire* from which the panel was drawn, he



asked the court to dismiss the *particular panel* sitting in that particular courtroom. The defendant had no guarantee that the next panel selected from the venire would not have the same composition; indeed, according to defendant's logic, counsel could have continued asking for dismissals until he finally found a panel that satisfied him. This is not the function of the Sixth Amendment cross-section requirement.

We previously have held that "[a]n accused has no right to demand that members of his race be on the jury which tries him." *Clark,* 112 R.I. at 275, 308 A.2d at 795. Accordingly, we consistently have upheld the refusal of a trial justice to order a new jury panel when, as here, the basis of the objection was that members of a defendant's race were not adequately represented in a particular panel of assembled jurors. *State v. Perry,* 725 A.2d 264, 268 (R.I.1999); *Gaines,* 528 A.2d at 308–09; *Clark,* 112 R.I. at 275, 308 A.2d at 795. We reach the same result here.

## IV

### Motion for a New Trial

Sosa's final contention on appeal concerns the trial justice's denial of his motion for a new trial. Sosa alleges that the trial justice's decision was against the weight and sufficiency of the evidence. To support this allegation, defendant argues that the state's witnesses were unworthy of belief and suggests several alternative factual hypotheses that the jury should have deduced from the evidence. This argument is without merit.

[17–19] When ruling on a motion for a new trial, the trial justice acts as a thirteenth juror and independently evaluates the credibility of the witnesses and the weight of the evidence. *State v. Otero,* 788 A.2d 469, 472 (R.I.2002) (citing *State v. Banach,* 648 A.2d 1363, 1367 (R.I.1994)). Once a trial justice has evaluated the evidence and articulated his or her reasons for denying the new trial, we will not disturb that decision unless he or she "overlooked or misconceived material evidence relating to a critical issue or if the justice was otherwise clearly wrong." *State v. Bleau,* 668 A.2d 642, 646 (R.I.1995) (quoting *Banach,* 648 A.2d at 1367). The defendant has not pointed to material evidence that the trial justice overlooked, nor are we of the opinion that the trial justice clearly was wrong. Accordingly, we reject defendant's final assignment of error.

### Conclusion

For the foregoing reasons, the judgment of conviction is affirmed, and the case is remanded to the Superior Court.

**In re WILLIAM R., et al.**

**No. 2001–261–Appeal.**

Supreme Court of Rhode Island.

Jan. 9, 2004.

**Background:** In child protection proceedings, the Superior Court, Providence County, John A. Mutter, J., entered decree terminating mother's parental rights, and mother appealed.

**Holdings:** The Supreme Court held that:

(1) evidence of mother's unfitness was sufficient to support termination of her parental rights;

(2) Department of Children, Youth, and their Families (DCYF) made reasonable efforts to encourage and strengthen relationship between mother and children; and